UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEBORAH D. PETERSON,<br>Personal Representative of<br>the Estate of James C. Knipple,<br>et al., | )<br>)<br>)<br>) |
| Plaintiffs, | ) |
| v. | )    Civil Action No. 01-2094 (RCL) |
| THE ISLAMIC REPUBLIC OF IRAN,<br>et al., | )<br>) |
| Defendants. | )  **FILED** |
| JOSEPH AND MARIE BOULOS,<br>Personal Representatives of the<br>Estate of Jeffrey Joseph Boulos,<br>et al., | )  MAY 3 0 2003<br>)  NANCY MAYER WHITTINGTON, CLERK<br>)       U.S. DISTRICT COURT<br>) |
| Plaintiffs, | )    Civil Action No. 01-2684 (RCL) |
| v. | ) |
| THE ISLAMIC REPUBLIC OF IRAN,<br>et al., | )<br>) |
| Defendants. | ) |

MEMORANDUM OPINION

These actions arise from the most deadly state-sponsored terrorist attack made against

American citizens prior to September 11, 2001: the Marine barracks bombing in Beirut, Lebanon

on October 23, 1983. In the early morning hours of that day, 241 American servicemen were

murdered in their sleep by a suicide bomber. On that day, an unspeakable horror invaded the

1

lives of those who survived the attack and the family members whose loved ones had been stolen from them. The memory of that horror continues to this day.

On March 17-18, 2003, this Court conducted a bench trial to determine the liability of the defendants for this inhuman act. Having reviewed the extensive evidence presented during that trial by both lay and expert witnesses, the Court has determined that the plaintiffs have established their right to obtain judicial relief against the defendants. The Court's findings of fact and conclusions of law are set forth below.

## I.    PROCEDURAL BACKGROUND

The plaintiffs in these two actions are family members of the 241 deceased servicemen (hereafter, "the servicemen") and the injured survivors of the attack. Plaintiffs have brought these actions in their own right, as administrators of the estates of the servicemen, and on behalf of the servicemen's heirs-at-law. All decedents and injured survivors of the attack were serving in the U.S. armed forces at the time of their injuries or death. All plaintiffs are nationals of the United States.[1]

On October 3 and December 28, 2001, plaintiffs filed separate complaints with this

---

[1] In an action under the Foreign Sovereign Immunities Act ("FSIA") for claims based on personal injury or death resulting from an act of state-sponsored terrorism, either the claimant or the victim must be an American national. See 28 U.S.C. § 1605(a)(7)(B)(ii). Although during the bench trial, the Court only received testimony that identified one of the decedents, James R. Knipple, as an American national, plaintiffs' counsel has represented that each and every service member injured or killed on October 23, 1983, or a beneficiary of that service member, is a national of the United States. The Court's findings are therefore subject to proof of American nationality during the damages phase of these proceedings. This may be accomplished either though direct testimony of any competent witness, or through the submission of relevant documentation.

2

Court. The complaints included statutory claims for wrongful death and common-law claims for battery, assault, and intentional infliction of emotional distress, all resulting from an act of state-sponsored terrorism. Plaintiffs sought relief in the form of compensatory and punitive damages. Although defendants were served with the two complaints on May 6 and July 17, 2002, defendants failed to file any response to either complaint, and on December 18, 2002, this Court entered defaults against defendants in both cases.

However, despite the entries of default, this Court is required to make a further inquiry prior to entering any judgment against defendants. FSIA mandates that a default judgment against a foreign state be entered only after a plaintiff "establishes his claim or right to relief by evidence that is satisfactory to the Court." 28 U.S.C. § 1608(e); see also Flatow v. The Islamic Republic of Iran, 999 F. Supp. 1, 6 (D.D.C. 1998). As in Flatow, the Court will require plaintiffs to establish their right to relief by clear and convincing evidence. The "clear and convincing" standard of proof is the standard required in the District of Columbia to support a claim for punitive damages, and is sufficient to establish a prima facie case in a contested proceeding. . . .

## II.    FINDINGS OF FACT

As stated above, this Court received testimony from plaintiffs on March 17 and 18, 2003, defendants having failed to enter an appearance. The Court now enters its findings of fact, based upon the sworn testimony and documentary evidence presented during the March trial, and received in accordance with the Federal Rules of Evidence. This Court finds these facts to be established by clear and convincing evidence.

3

A.    Historical Background[2]

The Republic of Lebanon is a mountainous country of approximately 3,800,000 people

bordered by Israel, Syria, and the eastern shore of the Mediterranean Sea.  Although it contains

some of the oldest human settlements in the world, including the Phoenician port cities of Tyre

and Sidon, it did not become an independent nation until 1944.

Lebanon did not participate militarily in the 1967 and 1973 Arab-Israeli wars.  However,

by 1973, approximately one out of every ten person living in Lebanon was a Palestinian refugee,

many of whom supported the efforts of the Palestine Liberation Organization (PLO) against

Israel.  Some of these refugees engaged in guerilla warfare and terrorist activity against Israel

from bases established in southern Lebanon.  Beginning in 1968, Israel engaged in reprisals

against these Palestinian strongholds in southern Lebanon.  In 1975, civil war broke out in

Lebanon between its Muslim inhabitants and Palestinian refugees, who supported the PLO, and

its Christian inhabitants, who opposed the PLO's actions.  The war would not come to a

complete end for another fifteen years, during which approximately twenty thousand Lebanese

were killed, and approximately the same number of Lebanese were wounded.

B.    The Arrival of the 24th Marine Amphibious Unit

In late 1982, with the concurrence of the United Nations, a multinational peacekeeping

coalition consisting of American, British, French, and Italian soldiers arrived in the Lebanese

capital of Beirut.  In May of 1983, the 24th Marine Amphibious Unit of the U.S. Marines ("the

---

[2] The Court has taken judicial notice of the facts contained in the following subsection,
pursuant to Rule 201 of the Federal Rules of Civil Procedure.

24th MAU") joined this coalition.[3] The rules of engagement issued to the servicemen of the 24th

MAU made clear that the servicemen possessed neither combatant nor police powers. In fact,

under the rules, the servicemen were ordered not to carry weapons with live rounds in their

chambers, and were not authorized to chamber the rounds in their weapons unless (1) they were

directly ordered to do so by a commissioned officer or (2) they found themselves in a situation

requiring the immediate use of deadly force in self-defense.[4] As pointed out during trial, the

---

[3] A Marine Amphibious Unit (now "Marine Expeditionary Unit") is a combined air / ground force unit of approximately two thousand U.S. Marines. See Marine Expeditionary Units, at http://www.usmc.mil/marinelink/ind.nsf/meus.

[4] In the present context, "rules of engagement" are directions issued by a competent military authority that set out the limitations and circumstances under which the forces under its command may initiate and prosecute combat engagement with other forces that they encounter. Following are the rules of engagement that were issued to the members of the 24th MAU:

1. When on post, mobile or foot patrol, keep loaded magazine in weapon, bolt closed, weapon on safe, no round in the chamber.

2. Do not chamber a round unless told to do so by a commissioned officer unless you must act in immediate self-defense where deadly force is authorized.

3. Keep ammo for crew-served weapons readily available, but not loaded. Weapon is on safe.

4. Call local forces [LAF] to assist in self-defense effort. Notify headquarters.

5. Use only minimum degree of force to accomplish any mission.

6. Stop the use of force when it is no longer needed to accomplish the mission.

7. If you receive effective hostile fire, direct your fire at the source. If possible, use friendly snipers.

8. Respect civilian property; do not attack it unless absolutely necessary to protect friendly forces.

9. Protect innocent civilians from harm.

members of the 24th MAU were more restricted in their use of force than an ordinary U.S.

citizen walking down a street in Washington, D.C.

The restrictive rules of engagement are consistent with the testimony of Col. Timothy

Geraghty, the commander of the 24th MAU, about the mission of the multinational peacekeeping

force:

> [E]ssentially what it was, it was primarily a peacekeeping mission and it was to show
> [our] presence, and when I say ours, and this is throughout all the forces, is that we were
> out showing a presence, [primarily] to provide stability to the area. And I might add that
> there's no doubt in just about anyone involved at the time, we saved a lot of lives by our
> presence there for awhile. And that was part of, I might add, in my judgment, the success
> of that, our presence mission there, and [that] it was working is the primary reason why
> we were targeted. . . .
> The rules – these were geared primarily again with the peacekeeping mission [in
> mind] and the sensitivities of killing or maiming someone accidentally. That could be a
> tinderbox. That could start a whole chain of events.

Col. Geraghty further testified that the location and security of the 24th MAU's position was not

tactical in nature, and was only acceptable to the commanding officer in the context of the unit's

mission to "provide a presence."

Based on the testimony of Col. Geraghty and other witnesses, the Court finds that on

October 23, 1983, the members of the 24th MAU, and the service members supporting the unit,

---

10.     Respect and protect recognized medical agencies such as Red Cross, Red
        Crescent, etc.

These ten rules were printed on cards distributed to every service member of the 24th MAU and
were discussed at length with every member.

were clearly non-combatants operating under peacetime rules of engagement.[5]

C.    The Iranian Government and the October 23 Attack[6]

Following the 1979 revolution spearheaded by the Ayatollah Ruhollah Khomeini, the

nation of Iran was transformed into an Islamic theocracy. The new government promptly drafted

a constitution, which is still in effect today. The preamble to the 1979 constitution sets forth the

mission of the post-revolutionary Iranian state:

> The mission of the Constitution is to realize the ideological objectives of
> the movement and to create conditions conducive to the development of man in
> accordance with the noble and universal values of Islam.
>     With due attention to the Islamic content of the Iranian Revolution, the
> Constitution provides the necessary basis for ensuring the continuation of the Revolution
> at home and abroad. In particular, in the development of international relations, the
> Constitution will strive with other Islamic and popular movements to prepare the
> way for the formation of a single world community . . . to assure the continuation of the
> struggle for the liberation of all deprived and oppressed peoples in the world.

The post-revolutionary government in Iran thus declared its commitment to spread the goals of

the 1979 revolution to other nations. Towards that end, between 1983 and 1988, the government

of Iran spent approximately $50 to $150 million financing terrorist organizations in the Near

East.[7] One of the nations to which the Iranian government directed its attention was the war-torn

---

[5]    It should also be noted that the death certificates issued for the victims of the October
23, 1983 attack did not represent that the victims were killed in action. Instead, the cause of
death was listed as "terrorist attack."

[6]    The facts contained in the following subsection are based on the trial testimony of Dr.
Reuven Paz, director of the Project for the Research of Islamist Movements in Herzliya, Israel,
and Dr. Patrick Clawson, deputy director of the Washington Institute for Near East Policy.

[7]    Since January 19, 1984, Iran has been designated as a state sponsor of terrorism
pursuant to section 6(j) of the Export Administration Act of 1979, 50 U.S.C. app. § 2405(j). This
designation arose in part as a result of the October 23, 1983 attack.

republic of Lebanon.

"Hezbollah" is an Arabic word meaning "the party of God." It is also the name of a group of Shi'ite Muslims in Lebanon that was formed under the auspices of the government of Iran. Hezbollah began its existence as a faction within a group of moderate Lebanese Shi'ites known as Amal. Following the 1982 Israeli invasion of Lebanon, the Iranian government sought to radicalize the Lebanese Shi'ite community, and encouraged Hezbollah to split from Amal. Having established the existence of Hezbollah as a separate entity, the government of Iran framed the primary objective of Hezbollah: to engage in terrorist activities in furtherance of the transformation of Lebanon into an Islamic theocracy modeled after Iran.

During the March trial in these cases, Dr. Patrick Clawson, a widely-renowned expert on Iranian affairs over the past 25 years, testified that in 1983, Hezbollah was a creature of the Iranian government:

> Both from the accounts of Hezbollah members and from the accounts of the Iranians and of every academic study that I'm aware of, certainly at this time, Hezbollah is largely under Iranian orders. It's almost entirely acting at the – under the order of the Iranians and being financed almost entirely by the Iranians. It comes to be an organization with Lebanese roots and Lebanese activities and more independence from Iran, but that's years past this time frame.

> \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

> THE COURT:    In the '83 time frame, it was essentially a tool of Iran.

> THE WITNESS:    Correct, sir. Indeed, both Iranian and Lebanese observers have described it as being established at Iran's orders and as being a creature of Iran when it began. Hezbollah leaders today will sometimes describe that as the roots of their party and say that it has evolved away from being that.

> Q:    Was there any other major means of support for Hezbollah other than the Islamic Republic of Iran?

8

A:    Not at this time, no, sir.[8]

Dr. Clawson's testimony was corroborated by Dr. Reuven Paz,[9] who has researched

Islamist terrorist groups for the last 25 years:

Q:    Now, as of the time of this attack, in October 1983, to what extent was Hezbollah, at that precise moment, dependent upon the support of Iran, and particularly the Iranian Revolutionary Guards, who had been brought in in order to carry out any type of major [military] operation?

A:    Well, I would say that they were, at that time, totally relied upon, the Iranian support. We are talking about composing a new group, of Hezbollah, out of people who had very little military experience. They were members, before '82, in groups that actually did not deal with military issues or terrorism. And most of the members during this process of unification that created Hezbollah started to be trained in training camps in the Bekaa Valley, where the main Iranian forces were located.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

Q:    Do you have an opinion, within a reasonable degree of certainty, as an expert on Islamist terrorism, whether this attack was carried out by Hezbollah, in response to the order which was the subject of the communications intercept in late September 1983?

A:    Yes, especially at that time — even today, but especially at that time, when Hezbollah was not yet formed as a strong group, it was totally controlled by Iran and actually served mainly the Iranian interest in Lebanon and [against] Israel.

Q:    Do you have an opinion, again within a reasonable degree of certainty, as an expert in Islamist terrorist groups, as to whether Hezbollah, at that time, the fall of 1983, would have had the capacity to carry out an attack of the dimension of the

---

[8] Dr. Michael Ledeen, a consultant to the Department of Defense at the time of the Marine barracks bombing and an expert on U.S. foreign relations, testified at trial that "Iran invented, created, funded, trained, and runs to this day Hezbollah, which is arguably the world's most dangerous terrorist organization."

[9] Dr. Paz is the director of the Project for the Research of Islamist Movements and a senior research fellow at The International Policy Institute for Counterterrorism, both of which are based in Herzliya, Israel.

9

attack around the Marine barracks, in the absence of Iranian scientific, financial, and material assistance?

A:    No, I don't think they could have carried out such an attack without Iranian training, without Iranian – Iranian supply of the explosives even, and without directions from the Iranian forces in Lebanon itself.[10]

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

Q:    Dr. Paz, can you describe the – the source of – of this technique of suicide bombing, which was used in the attack on the Marine barracks and since, unfortunately, many other incidents?

A:    Yes, this – this modus operandi actually was initiated in Iran and it was – it was not, at that time, used in anywhere in – in the Sunni Muslim world. It was at that time a Shi'ite ideology of self-sacrifice by suicide bombing. It started during the Iran-Iraq war in the '80s, and then under Iranian training and influence and instructions, it started as a modus operandi of terrorist groups – first in Lebanon, by Hezbollah, and then later on it moved to the Palestinian arena, mainly during the '90s.

It is clear that the formation and emergence of Hezbollah as a major terrorist organization is due to the government of Iran. Hezbollah presently receives extensive financial and military technical support from Iran, which funds and supports terrorist activities. The primary agency through which the Iranian government both established and exercised operational control over Hezbollah was the Iranian Ministry of Information and Security ("MOIS"). MOIS had formerly served as the secret police of the Shah of Iran prior to his overthrow in 1979. Despite the revolutionary government's complete break with the old regime, it did not disband MOIS, but

---

[10] Robert Baer, a case officer in the Directorate of Operations of the CIA from 1976-97, testified at trial that "Hezbollah wasn't 'formally' created until 1985. What happened was before it was a bunch of agents of Iran. But none of these agents, based on our intelligence, which was . . . outstanding, were operating on their own. One time there was a case where a Hezbollah member went out and kidnapped some children. But that was done independently, and the moment he was caught, he was executed by Hezbollah because he wasn't operating with authority from Iran."

instead allowed it to continue its operations as the intelligence organization of the new government. Based on the evidence presented at trial, the Court finds that MOIS acted as a conduit for the Islamic Republic of Iran's provision of funds to Hezbollah, provided explosives to Hezbollah and, at all times relevant to these proceedings, exercised operational control over Hezbollah.

It is clear that MOIS was no rogue agency acting outside of the control and authority of the Iranian government. Indeed, as Dr. Clawson testified at trial, the October 23 attack would have been impossible without the express approval of Iranian government leaders at the highest level:

Q:    In the fall of 1983, was there anything of a significant nature, and especially a terrorist attack the dimensions of the attack on the Marine barracks of October 23rd, 1983, which would or could have been undertaken by Hezbollah without material support from Iran?

A:    Iran's material support would have been absolutely essential for any activities at that time, and furthermore, the politics of the organization [was such] that no one in the organization would have thought about carrying out an activity without Iranian approval and almost certainly Iranian orders.

Q:    Is that opinion within a reasonable degree of certainty as an expert on Iran?

A:    Oh, absolutely, sir.

Q:    Would any operation such as the October 23rd, 1983 attack require the approval within Iran of the Ministry of Information and Security?

Q:    Yes, sir.

A:    What about Mr. Rafsanjani?

Q:    There would have been a discussion in the National Security Council which would involve the prime minister, Mr. Rafsanjani, and it would also have required the approval of Iran's supreme religious leader, Ayatollah Khomeini. We have

11

many detailed accounts about the approval process from other attacks at this time, and, indeed, from a number of Iranians who became disillusioned within this process and later left.

Q:     Doctor, your opinion within a reasonable degree of certainty as an expert on Iran, what was the foreign policy objective of the October 23rd, 1983, attack and other like attacks by Iran during this period?

A:     Both to end the Western, especially the American presence in Lebanon, and to establish Iran's image as the leader of the world's radical, anti-Western, anti-American Muslim movement.

The two officials named by Dr. Clawson, the Ayatollah Ruhollah Khomeini and Ali Akbar Hashemi Rafsanjani, were high government officials in the Iranian government, occupying the positions of Supreme Leader and President.[11] The approval of both the Ayatollah Khomeini and President Rafsanjani was absolutely necessary to carry out the continuing economic commitment of Iran to Hezbollah, and to execute the October 23 attack. Given their positions of authority, any act of these two officials must be deemed an act of the government of Iran.

The complicity of Iran in the 1983 attack was established conclusively at trial by the testimony of Admiral James A. Lyons, Deputy Chief of Naval Operations for Plans, Policy and Operation from 1983-85. As deputy chief, Admiral Lyons routinely received intelligence information about American military forces. On October 25, 1983, the chief of naval intelligence notified Admiral Lyons of an intercept of a message between Tehran and Damascus that had been made on or about September 26, 1983. The message had been sent from MOIS to the

---

[11] Under the 1979 constitution, the Supreme Leader is the highest government official of Iran, followed by the President. The powers of the Supreme Leader include the authority to delineate the general policies of Iran and supervise their execution, assume the supreme command of the armed forces, declare war, mobilize the armed forces, appoint and dismiss key government officials, and issue decrees for national referenda. Arts. 110, 113, Constitution of Iran, 1979.

Iranian ambassador to Syria, Ali Akbar Mohtashemi, who presently serves as an adviser to the

president of Iran, Mohammad Khatami.[12] The message directed the Iranian ambassador to

contact Hussein Musawi, the leader of the terrorist group Islamic Amal, and to instruct him to

have his group instigate attacks against the multinational coalition in Lebanon, and "to take a

spectacular action against the United States Marines." Admiral Lyons testified that he has

absolutely no doubt of the authenticity or reliability of the message, which he took immediately

to the secretary of the navy and chief of naval operations, who viewed it, as he did, as a "24-karat

gold document."[13]

Although it is not presently known whether Ambassador Mohtashemi contacted Musawi,

evidence was presented at trial that Mohtashemi did proceed to contact a member of the Iranian

Revolutionary Guard ("IRG"), and instructed him to instigate the Marine barracks bombing.[14]

The Court heard the videotaped deposition testimony of a Hezbollah member known by the

pseudonym "Mahmoud," who was a member of the group that carried out the October 23

---

[12] Mohtashemi's last name is sometimes given as "Mohtashemi-Pur."

[13] Dr. Michael Ledeen testified at trial that the message intercept was "one of the most
impressive works of intelligence analysis that I saw [about the Marine barracks bombing], and it
was absolutely convincing." Dr. Reuven Paz testified that he had read and analyzed the message
intercept, which he described as "an order to attack the foreign powers on Lebanese soil, meaning
the United States, the French paramilitary power, and of course, the Israeli military forces in
south Lebanon."

[14] The Iranian Revolutionary Guard, also known as the Pasdaran, has been described as
an "elite security and military force that was formed to protect the ideological purity of the
Ayatullah Khomeini's Islamic Revolution and [that] has since developed considerable expertise
in covert actions overseas." See Paul Quinn-Judge, Stalking Satan: As Their Leader Offers
Friendship, Iran's Revolutionary Guards Keep a Menacing Watch over Their Backyard, TIME,
March 30, 1998, available at http://www.time.com/time/magazine/1998/int/980330/
terrorism.stalking satan15.html.

attack.[15] Mahmoud, a Lebanese Shi'ite Muslim, testified that Ambassador Mohtashemi contacted a man named Kanani, the leader of the Lebanese headquarters of the IRG. Mohtashemi instructed Kanani to go forward with attacks that had been planned against the 24th MAU and the French paratroopers.[16] Mahmoud testified that a meeting was later held in Baalbek, Lebanon, which was attended by Kanani and Sheik Sobhi Tufaili, Sheik Abbas Musawi, and Sheik Hassan Nasrallah. Nasrallah is the present leader of Hezbollah.[17] Musawi, Nasrallah's immediate predecessor as the leader of Hezbollah, was killed in a February 16, 1992 Israeli attack.[18] Tufaili is a former secretary general of Hezbollah.[19]

---

[15] The reliability of Mahmoud's testimony was established by an individual who has worked for the United States government in an intelligence capacity for thirty years, and who is known by the pseudonym "Joseph Salam." The Court admitted Salam as an expert on Islamic terrorist groups, based upon the quality and quantity of knowledge contained in his curriculum vita, which was filed under seal to protect Salam's identity. According to Salam, Mahmoud has provided information to him in the past, and, after later comparison with known objective facts, his information has always been determined to be accurate.

[16] Mahmoud's testimony about Ambassador Mohtashemi is confirmed by Joseph Salam, who testified that although Mohtashemi held the title of Iranian ambassador to Syria, he performed no actual diplomatic function and was "highly placed in the supervision and origination of covert terrorist operations by Iran." It is also independently confirmed by Dr. Michael Ledeen, who testified at trial that "Mr. Mohtashemi-Pur, his nickname in Iran is the Father of Hezbollah. He's the person who created Hezbollah. So of course he had a major involvement in [the Marine barracks bombing] since those were the people who did it." Dr. Ledeen also testified that "there was information of every imaginable type that enabled [the intelligence community] to reconstruct a picture which showed very clearly the Iranian involvement [in the Marine barracks bombing]. I don't know anyone who looked at that information who came to any other conclusion."

[17] See Talks with France Bridge the Diplomatic Gap, TIMES (London), May 26, 2003, at 13, available at 2003 WL 3134823 ("[Israeli Foreign Minister Sylvan Shalom's] warning came as the leader of Hezbollah, Sheikh Hassan Nasrallah, urged all anti-Israeli groups in Lebanon to take up arms in preparation for a possible Israeli attack.").

[19] See Kenneth R. Timmerman, Likely Mastermind Of Tower Attacks, INSIGHT, Dec. 31, 2001, at 18, available at 2001 WL 29585000 ("On March 17, 1992, a Hezbollah strike team

During this meeting, Kanani and the Hezbollah members formed a plan to carry out simultaneous attacks against the American and French barracks in Lebanon.[20] Mahmoud described the meeting and its aftermath:

> They got the order. They met and adopted the operation against the Marines and the French barracks in the same time. The Marines operation was done. They moved – they moved with one Iranian and one Shiite from the – Southern Lebanon over the mountain road to Hartareq Biralabin [phonetic spelling]. They stayed two days there.
>
> The – the cars were built, equipped, in Biralabin in a warehouse near a – gas station . . . underground. They built the cars. They equipped the cars there. That's their center.
>
> One Dodge, one red Dodge, that was painted exactly like the other – the real Dodge that was providing water and other stuff to the Marines, and they moved it to the airport road where they put the hold on – ambush and hold the real car when she arrived. They stopped the real car and they moved with the fake one that was built with explosives toward the Marine barracks.

---

leveled the Israeli Embassy in Buenos Aires, killing 29 persons and wounding 242. Hezbollah said the attack was intended to avenge the killing of Lebanese Hezbollah leader Sheik Abbas Musawi, whose convoy was obliterated by Israeli helicopter gunships in South Lebanon one month earlier."); Gareth Smyth, Sheikh Hassan Nasrallah's Holy War, FIN. TIMES, Aug. 30, 2001, available at 2001 WL 26065111 ("On February 16, 1992, Israeli helicopter gunships flew into south Lebanon and ambushed a convoy of cars, killing Abbas Musawi, the general secretary of Hizbollah. . . . [I]t brought to Hizbollah's top position Israel's most effective adversary of the next decade. With his beard, turban and black-rimmed glasses, Sheikh Hassan Nasrallah is recognised well beyond Lebanon's borders.").

[19] See Hikmat Chreif, Hezbollah Dissidents Demonstrate Against Normalization with Israel, AGENCE FRANCE-PRESSE, Jan. 7, 2000, available at 2000 WL 2708811 ("About 3,000 supporters of Lebanese Hezbollah dissident Sobhi Tufaili demonstrated in Baalbek Friday against any normalization with Israel and visits by Israeli tourists to Lebanon. . . . Tufaili, who used to be secretary general of Hezbollah, criticized the group's leadership for neglecting the needs of the 'underprivileged,' especially in the Baalbek-Hermel area, which had been a major drug-growing area until a crackdown in 1992.").

[20] Approximately eight minutes after the attack on the Marine barracks, a similar attack was attempted against the French barracks. Although the driver of the vehicle carrying the explosive device was shot and killed before the vehicle could enter the barracks, the device was detonated by remote control, killing 56 French soldiers.

C.    The Attack

As testified by Mahmoud, after the meeting in Baalbek, a 19-ton truck was disguised so

that it would resemble a water delivery truck that routinely arrived at the Beirut International

Airport, which was located near the U.S. Marine barracks in Beirut, and modified the truck so

that it could transport an explosive device. On the morning of October 23, 1983, members of

Hezbollah ambushed the real water delivery truck before it arrived at the barracks. An observer

was placed on a hill near the barracks to monitor the operation. The fake water delivery truck

then set out for the barracks, driven by Ismalal Ascari, an Iranian.

At approximately 6:25 a.m. Beirut time, the truck drove past the Marine barracks. As the

truck circled in the large parking lot behind the barracks, it increased its speed. The truck

crashed through a concertina wire barrier and a wall of sandbags, and entered the barracks.[21]

When the truck reached the center of the barracks, the bomb in the truck detonated.

The resulting explosion was the largest non-nuclear explosion that had ever been

detonated on the face of the Earth. The force of its impact ripped locked doors from their

doorjambs at the nearest building, which was 256 feet away. Trees located 370 feet away were

shredded and completely exfoliated. At the traffic control tower of the Beirut International

Airport, over half a mile away, all of the windows shattered. The support columns of the Marine

barracks, which were made of reinforced concrete, were stretched, as an expert witness

described, "like rubber bands." The explosion created a crater in the earth over eight feet deep.

The four-story Marine barracks was reduced to fifteen feet of rubble.

---

[21] Concertina wire is a length of barbed wire that is extended into a spiral for use as a
barrier, as on a fence. It is employed by the U.S. armed forces to prevent entry into restricted
areas by unauthorized persons.

16

The force of the explosion was equal to between 15,000 to 21,000 pounds of TNT. FBI and ATF explosives experts both concluded that the explosive material was "bulk form" pentaerythritol tetranitrate, or PETN. Danny A. Defenbaugh, the on-scene FBI forensic explosive investigator, testified as to his findings:

> [W]e were able to, through the forensic residue analysis, identify the explosive material, and it was unconsumed particles of PETN . . . .
>
> PETN is a primary explosive that is manufactured commercially and primarily for U.S. military purposes. It is a primary explosive that is used in detonating cord. Detonating cord is nothing more than a plastic and fiber-wrapped cord that has the PETN, which looks like a white powder . . . that is then extruded inside of that cord . . . .
>
> In this case, it was not [consumed]; we found unconsumed particles of PETN. That was just like we had found also in the American Embassy bombing. What that means is that it had to have been from a bulk explosive, it had to have been from a manufacturer.

Defenbaugh explained that when the commercially-manufactured form of PETN is detonated, it is completely consumed in the ensuing explosion. The presence of unconsumed particles of PETN at the Marine barracks blast site, therefore, indicated that the PETN used in the bomb had not been the standard commercially-available form of the explosive. Instead, it had been the raw "bulk form" of PETN, which is not generally sold commercially. In the Middle East, the bulk form of PETN is produced by state-sponsored manufacturers for military purposes. In 1983, bulk form PETN was not manufactured in the nation of Lebanon. However, at that time, bulk form PETN was manufactured within the borders of Iran.

Warren Parker, who served as an explosives expert with the Army and the ATF for forty years, testified that the effectiveness of the attack demonstrated that it had been the result of careful planning.[22] Parker also concluded, based on the degree of planning and sophistication

---

[22] Parker testified at trial:

that went into the attack, that a group of individuals without specialized training in explosives could not have carried it out:

> Q:    Mr. Parker, in your opinion, within a reasonable degree of certainty as an expert in explosives, could this bombing have been successfully carried out by a group of individuals with limited education, possessing minimal literacy and no specialized training in explosives?

> A:    No, sir.

> Q:    And what do you base that opinion on?

> A:    The degree of planning, the degree of sophistication of this bombing. . . . The fact that it was a significant amount of a military-type explosive. These are not things that you just go down to the drugstore and buy a pound of, these are not things [for which] you buy innocuous materials and manufacture in your backyard. PETN is manufactured in factories that have specialized tools and equipment and knowledge.
>
>    I think that I will concur with Mr. Defenbaugh's conclusion that it is a state- or military-run factory that produces this type of material, and I think the fact that it was carried out so successfully and not bungled really enhances the fact that somebody had practiced this before. . . .
>
>    [D]uring the, say, late '60s, early '70s, clear up into the '80s, there were state-sponsored training camps involving the use of explosives for political gain, and these training camps used as part of their training, and I have seen

In the Marine barracks [attack], we have considerable planning that had to occur. They had to know what the interior of the building looked like, and, in my background and experience, I believe that the placement of that in the center of the building with the atrium opening up to the top was probably key in causing most of the deaths.

So it took someone getting in there, doing a lot of pre-scouting, making sure that they could, in fact, penetrate the barriers, the barbed-wire barriers, negotiate the pipes that were placed in the way to deter traffic. They had to use a site that had a direct line because they couldn't afford to take a long time. The Marines were all armed. While they didn't have ammunition ready, and that was probably known, they would have likely not made it inside. So if they had tried to come through some sort of a circuitous route rather than a direct attack down through those barrier pipes right over [the] top of what I believe to be the only place that you could have gotten a truck of that size into the building without it being impinged or stopped by some part of the building itself – so they knew that that was a good entrance. They knew that the truck could negotiate those pipes and that the weak part for entrance was there at the sandbag guard barricade and that the interior of the building was the vulnerable spot of that building.

18

materials seized from those that included pages from military manuals, U.S. military as well as English and French military manuals, as part of their training in calculating the explosive charges.

Q:     I believe this Court in [Eisenfeld v. Islamic Republic of Iran] received testimony with regard to a training camp with regard to handling explosives just outside Tehran, Iran, run by the Iranian government. Would this be the kind of thing you're talking about, an intensive course over three or four months?

A:     Yes, sir, those are exactly the kinds. There were several of those. The one in Iran was just one of several but typical of that.

Based on the evidence presented by the expert witnesses at trial, the Court finds that it is beyond question that Hezbollah and its agents received massive material and technical support from the Iranian government. The sophistication demonstrated in the placement of an explosive charge in the center of the Marine barracks building and the devastating effect of the detonation of the charge indicates that it is highly unlikely that this attack could have resulted in such loss of life without the assistance of regular military forces, such as those of Iran.

As a result of the Marine barracks explosion, 241 servicemen were killed, and many others suffered severe injuries. Steve Russell, the sergeant of the guard at the time of the explosion, testified that he had observed several victims of the bombing who were in severe pain before their deaths. Sgt. Russell stated that death was not instantaneous for many of the victims, and that many of the victims of the explosion endured extreme pain and suffering.

During the trial, family members of the victims testified about the anguish they endured when they learned of the attack. Deborah Peterson described what happened when she received word of the attack on the Marine barracks, where her brother, Corporal James Knipple, was stationed:

It was Sunday morning and I was sleeping and I got a phone call from my father. He had

19

a frantic sound to his voice that I had never heard before and he said – he just screamed, "Debbie, our worst nightmare has been realized. And I turned on the television and saw what was happening. . . .

It seemed like an awful long time [before word of his death was received]. We waited and waited and waited. We watched every television, we were – I mean, the house was filled with people. We watched the television, we got every newspaper, photograph, magazine we could. We looked for his face among the survivors. We even thought we saw him a couple of times. All of his friends gathered, neighbors, and we held out hope even though the count was rising. . . .

I think around November 7th or 8th, we got a phone call . . . They wanted dental information and identifying marks, anything we could give them, and my father told them about a scar on his forearm. The next day, they told us that he was identified.

We brought him home on the 9th, on his 21st birthday, and we buried him on the 10th, the Marine Corps birthday. I remember the casualty officer, he was all by himself, he came to the house. We were all gathered around, and he told us that Jim was among the dead. It was official.

I remember the casualty officer sitting next to my father and they both seemed really quiet while everybody else was screaming and yelling and crying, and my dad just sat there really quiet. And then when everybody left, he went downstairs and started to scream Jim's name over and over and over again at the top of his lungs.

### III.   CONCLUSIONS OF LAW

Having made the above-listed findings of fact, the Court now enters the following conclusions of law:

1.    An action brought against a foreign state, its intelligence service acting as its agent, and its officials, acting in their official capacity, must be brought under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602-1611 et seq. The FSIA must be applied in every action involving a foreign state defendant. Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 489; 28 U.S.C. § 1330. The sole bases for subject matter jurisdiction in an action against a foreign state defendant are the FSIA's enumerated

20

exceptions to immunity. <u>Argentine Republic v. Amerada Hess Shipping Corp.</u>, 488 U.S.
428, 434 (1989). This Court lacks subject matter jurisdiction over the present actions
unless they fall within one of the FSIA's enumerated exceptions to foreign sovereign
immunity. <u>See</u> <u>Saudi Arabia v. Nelson</u>, 507 U.S. 349, 355 (1993). The FSIA has been
construed to apply to individuals for acts performed in their official capacity on behalf of
either a foreign state or its agency or instrumentality. <u>El-Fadl v. Central Bank of Jordan</u>,
75 F.3d 668, 671 (D.C. Cir.1996) (citing <u>Chuidian v. Philippine Nat'l Bank</u>, 912 F.2d
1095, 1101-1103 (9th Cir. 1990).

2.     When it passed the Antiterrorism and Effective Death Penalty Act of 1996, Congress
lifted the immunity of foreign states for certain sovereign acts that are repugnant to the
United States and the international community, and created a right of civil action based
upon the commission of terrorist acts. Pub. L. 104-132, Title II, § 221(a), (April 24,
1996), 110 Stat. 1214, <u>codified at</u> 28 U.S.C.A. § 1605 (West 1997 Supp.). That Act
created an exception to the immunity of those foreign states officially designated by the
State Department as state sponsors of terrorism, if the foreign state so designated commits
a terrorist act, or provides material support and resources to an individual or entity which
commits a terrorist act, which results in the death or personal injury of a United States
citizen. <u>See</u> 28 U.S.C. § 1605(a)(7); <u>see also</u> H. R. REP. No. 104-383, at 137-38 (1995).

3.     Iran has continuously been designated a state sponsor of terrorism by the U.S. Department
of State since January 19, 1984.

4.  Applying the above-mentioned law, as a consequence of the actions of the defendants, this Court concludes that it possesses subject matter jurisdiction over the defendants in these actions, the Islamic Republic of Iran and the Iranian Ministry of Information and Security.

5.  28 U.S.C. § 1605(a)(7) provides for personal jurisdiction over foreign state sponsors of terrorism. As this Court has noted in a previous case involving the government of Iran, "[because] international terrorism is subject to universal jurisdiction, Defendants had adequate notice that their actions were wrongful and susceptible to adjudication in the United States." Flatow, 999 F. Supp. at 14 (citing Eric S. Kobrick, The Ex Post Facto Prohibition and the Exercise of Universal Jurisdiction over International Crimes, 87 COLUM. L. REV. 1515, 1528-30 (1987)); see also Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 88-89 (D.C. Cir. 2002) ("In enacting [28 U.S.C. § 1605(a)(7)], Congress sought to create a judicial forum for compensating the victims of terrorism, and in so doing to punish foreign states who have committed or sponsored such acts and deter them from doing so in the future.")

6.  Applying the above-mentioned law, this Court concludes that it possesses personal jurisdiction over the defendants in these actions, the Islamic Republic of Iran and the Iranian Ministry of Information and Security.

22

7.    28 U.S.C. § 1605(f) provides for a statute of limitations of "10 years after the date on

which the cause of action arose," and provides for equitable tolling during the "period

during which the foreign state was immune from suit."

8.    The state of Iran was immune from suit until passage of Pub. L. 104-132, which was

made effective on April 24, 1996.  Accordingly, the Court concludes that the statute of

limitations contained in 28 U.S.C. § 1605(f) does not bar these actions.

9.    In a memorandum opinion issued December 18, 2002, this Court stated that if the

plaintiffs in these actions proved that the U.S. military service members at issue in these

cases were part of a peacekeeping mission and that they operated under peacetime rules

of engagement, they would qualify for recovery.  As set forth in the above findings of

fact, the plaintiffs have demonstrated that the U.S. military service members at issue were

part of a peacekeeping mission, and that they were operating under peacetime rules of

engagement.  Therefore, the Court concludes that the military service members at issue in

these cases qualify for recovery.

10.    A foreign state is liable for money damages under the FSIA "for personal injury or death

that was caused by an act of . . . extrajudicial killing, or the provision of material support

or resources . . . for such an act if such act or provision of material support is engaged in

by an official, employee, or agent of such foreign state while acting within the scope of

his or her office, employment, or agency." 28 U.S.C. § 1605(a)(7).  The foreign state

23

must be designated as a state sponsor of terrorism under either section 6(j) of the Export Administration Act of 1979, 50 U.S.C. app. 2405(j) or section 620A of the Foreign Assistance Act of 1961, 22 U.S.C. 2371, at the time that the act occurred, unless the foreign state is thus designated later as a result of that act. Id. Either the victim or the plaintiff must have been a United States national at the time of the act. Id. Additionally, the act must be such that it would be actionable if the United States, its agents, officials or employees within the United States engaged in similar conduct. The Court concludes, based on the above findings of fact, that plaintiffs in these actions have established all of these elements by clear and convincing evidence.

11.    The FISA utilizes the same definition of "extrajudicial killing" as the Torture Victim Protection Act of 1991, which defines an "extrajudicial killing" as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all judicial guarantees which are recognized as indispensable by civilized peoples. . . ." Pub. L. 102-256, 106 Stat. 73 (1992). The Court concludes that the act undertaken by agents of Hezbollah – the development and detonation of an explosive charge in the barracks of the 24th MAU on October 23, 1983, which resulted in the deaths of over 241 peacekeeping American servicemen – satisfies the FISA's definition of an "extrajudicial killing."

12.    The Court finds that MOIS, acting as an agent of the Islamic Republic of Iran, performed acts on or about October 23, 1983, within the scope of its agency (within the meaning of

24

28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. § 1605 note), which acts caused the deaths of over 241 peacekeeping servicemen at the Marine barracks in Beirut, Lebanon. Specifically, the deaths of these servicemen were the direct result of an explosion of material that was transported into the headquarters of the 24th MAU and intentionally detonated at approximately 6:25 a.m., Beirut time by an Iranian MOIS operative. The Court therefore concludes that MOIS actively participated in the attack on October 23, 1983, which was carried out by MOIS agents with the assistance of Hezbollah.

13. The Court concludes that the deaths of over 241 peacekeeping servicemen at the Marine barracks in Beirut, Lebanon were caused by a willful and deliberate act of extrajudicial killing.

14. As the result of the deaths of the 241 American servicemen in Beirut, Lebanon, their parents, surviving siblings, children, and spouses have suffered and will continue to suffer severe mental anguish and loss of society.

15. It is beyond dispute that if officials of the United States, acting in their official capacities, provided material support to a terrorist group to carry out an attack of this type, they would be civilly liable and would have no defense of immunity. See 42 U.S.C. § 1983; Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971).

16.    The Court concludes that the defendants, the Islamic Republic of Iran and the Iranian

Ministry of Information and Security, are jointly and severally liable to the plaintiffs for

compensatory and punitive damages.

17.    As to each claim of each Complaint, the Court will make a determination of the proper

amount of compensatory damages after its receipt of reports from the special masters

appointed by the Court. The Court will also make a determination as to punitive damages

at that time.

## IV.    CONCLUSION

The Court is mindful that some may question the utility of the present suit. During the

March trial, the Court heard testimony from a number of witnesses as to the reasons why this suit

was brought, and as to its potential efficacy.

Dr. Patrick Clawson, deputy director of the Washington Institute for Near East Policy,

described the manner in which civil judgments for acts of state-sponsored terrorism have had a

noticeable impact upon the present regime in Iran:

Q:    To what extent since its creation in 1979 has the Islamic Republic of Iran been
susceptible to influence because of economic sanctions? By sanctions, I don't
mean something that was stated, but simply having to pay out bucks, whether it's
in damages in personal injury cases or damages awarded by a tribunal, punitive
damages, anything of that sort?

A:    To begin with, the release of those held hostage at the American Embassy in
Tehran, most Iranian observers think that the American freezing of billions of
dollars of Iranian assets and the eventual negotiations which really hinged around

26

how much money Iran was going to get back is a good example from the very beginning of this process of Iran's susceptibility to economic pressure, and there have been a number of situations since in which Iran has been deflected from its main course by economic pressures. For instance, the Europeans [were] successful at doing that in the early 1990s, deflecting Iran from terrorist activities in European soil.

    \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

Q:    Given the enormity of the offense committed on October 23rd, 1983, in the attack of the Marine barracks, how much of that sum in the pockets of Iran would have to be subtracted before – in order to give some indication that they would start to change policy?

A:    Well, sir, I would – the larger the sum, the more of an impact this is going to have on the Iranians, and if this court case results in a large judgment, be it for compensatory or punitive damages, that is very likely to receive the attention of a fair number of policymakers in Iran, and I have great confidence that the Iranian leaders will consider that in deciding which way to proceed.

    \*        \*     \*     \*     \*     \*     \*     \*     \*     \*\*

I think, sir, that the Iranians have been extraordinarily sensitive to court actions, whether it was in Germany or in Argentina or in the United States, which make any references to the top leadership of the country being involved in these cases. That has been a matter of greatest sensitivity in Iran, and there have been several cases in which the Iranians reacted extremely strongly, particularly to suggestions that the supreme religious leader was involved in any way in these activities. . . . I have to say that I think that they pay quite detailed attention to these judgments . . . .

    \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

I would say that based on the past precedent about the way that these court cases have been viewed, what will be looked at very closely is two things. One is the size of the dollars involved, and the other is whether or not there is any change in the way that the court views the matter. So this case, if it involves a much larger judgment in dollar terms than previous cases, will be regarded as a toughening of the American stance.

On the other hand, there will be close examination of whether or not this case in its legal reasoning or in the application or non-application of punitive damages involves any change in the way in which a court rules. So, for instance, a lack of punitive damages would be regarded as an indication that the United States Government is making a gesture towards Iran.

Q:      A softening of our position.

A:      Correct, sir. . . .

Q:      So as I read you correctly, less in punitive damages than has been awarded in
        cases before would be to the Iranians a softening of the American resolve; more
        would be a hardening of the American resolve?

A:      Correct, sir.

The Court also heard the testimony of Dr. Michael Ledeen[23] as to the likely effect of an

award of damages in the present actions:

> THE COURT:      From your experience dealing all these years now with Iran, have
>                 you seen, from the court cases where punitive damages have been
>                 entered by the courts, what impact, if any, that has had in Iran and
>                 on the government, and what do you think of that?
>
> A:              Well, it hurts the government because it stings them, and the people see – what
>                 the Iranian people need to reach the point where they are willing to risk their lives
>                 to bring down this regime is that the civilized world understands what kind of
>                 regime it is and therefore would welcome that kind of event; and consequently, in
>                 my opinion, every time that regime is condemned and punished in a Western
>                 court, that hastens the moment of the downfall of that regime.[24]

---

[23] As noted above, Dr. Ledeen served as a consultant to the U.S. Defense Department at
the time of the October 23, 1983 bombing, and is one of the premier experts in the nation on the
subject of U.S. foreign relations. He is presently a resident scholar at the American Enterprise
Institute.

[24] Regarding the tension between the Iranian government and the populace, Dr. Ledeen
testified that

> the people of Iran hate the regime. Even the public opinion polls taken by the regime
> itself show that 70-plus percent of the Iranian people don't like the regime, would like a
> national referendum, deplore the foreign policy of the regime and want better relations
> with the United States, and you would have to figure that if 70 percent of Iranians will tell
> people that they know are coming from the Ministry of Information that they hate the
> regime, that the real number must be something higher than that.

28

The Court also heard testimony from the men and women who have brought the present actions about their reasons for so doing. During the trial, Lt. Col. Howard Gerlach, who was paralyzed in the October 23 attack, was asked about what he hoped to achieve by participating in these actions:

Well, I guess there's three words: accountability, deterrence and justice. And they are interrelated. The accountability, and I swear it was on Sunday, I was listening to a rerun of one of the TV – I don't know, Meet the Press or whatever, but Vice President Cheney was talking and he was saying that they, the terrorists feel that they can do things with impunity, and he said ever since the Marines in '83. Yes, there hasn't been any accountability.

Deterrence effect is, in some way, and this is also what he was talking about, was one thing we have to go after – and I think I'm stating this correctly; this is what I heard, is the funding. It's the funding. Even on the radio coming over here, we heard some talk about funding for terrorist organizations.

Then the third thing is the justice, and this refers to the people, a good portion of [whom] are in this room. . . . They lost a large chunk of their lives, young Marines, sons; husbands, fathers, brothers. They were attempting to do a noble thing. They went as peacekeepers in the tradition of this country. . . . [W]e weren't trying to conquer land; we weren't trying to get anything for ourselves; we were really trying in a humanitarian way to help those people in Lebanon. I think this is . . . the day in court, literally and figuratively speaking, for recognition of just how great these guys were.

The Court also heard the testimony of Lynn Smith Derbyshire, whose brother, Capt. Vincent Smith, was killed in the October 23 attack:

I'm not sure it's true that time heals wounds, but even so, a wound which has healed over time is not the same thing as not having a wound. Even a healing wound gets reopened from time to time.

    *        *        *        *        *        *        *        *        *        *

[A]s I have talked to so many of the Beirut families, I believe that many of them would concur with me when I say that the pain does not stop when you bury the dead; it is only the very beginning. We feel this loss over and over and over again. It does not go away and it does not lessen with time; that is a myth. It is more like teaching someone who has a chronic pain disorder how to manage and embrace their pain than it is a lessening of pain.

29

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

I have spoken to quite a number of the family member and I think we're all — I think they would all agree with me when I tell you that what Vince would have wanted was justice.

Vince was a fair-minded man. Vince was a man of integrity, as I know so many of the men who were lost that day were. It's the kind of men Marines are. That's what the Marine Corps produces. And Vince would have wanted us to fight.

Vince would have said . . . we must hold these men accountable. Vince would have said that it is time for justice, that it is time for compensation, that it is time to make it — to make them pay enough to make them stop, because Vince was a man who believed in what was right, and if he had lived, he would be sitting here in my place and he would be saying, "Come on, sis, let's go get them."

But he can't be here, and in his name, and in his honor, and with the permission of some of the other family members here . . . in their names and in their honor, I salute them, and we stand together to do what they cannot do for themselves.

There is little that the Court can add to the eloquent words of these witnesses. No order from this Court will restore any of the 241 lives that were stolen on October 23, 1983. Nor is this Court able to heal the pain that has become a permanent part of the lives of their mothers and fathers, their spouses and siblings, and their sons and daughters. But the Court can take steps that will punish the men who carried out this unspeakable attack, and in so doing, try to achieve some small measure of justice for its survivors, and for the family members of the 241 Americans who never came home.

A separate order accompanies this opinion.

Date: _5-30-03_

Royce C. Lamberth
United States District Judge

30

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEBORAH D. PETERSON,                          )
    Personal Representative of             )
    the Estate of James C. Knipple,       )
    et al.,                               )
                             )
                Plaintiffs,        )
                              )
                v.                 )          Civil Action No. 01-2094 (RCL)
                              )
THE ISLAMIC REPUBLIC OF IRAN,                 )
    et al.,                               )
                Defendants.        )
                              )
_____              )

JOSEPH AND MARIE BOULOS,                      )
    Personal Representatives of the       )
    Estate of Jeffrey Joseph Boulos,      )
    et al.,                               )
                              )
                Plaintiffs,        )          Civil Action No. 01-2684 (RCL)
                              )
                v.                 )
                              )
THE ISLAMIC REPUBLIC OF IRAN,                 )
    et al.,                               )
                Defendants.        )
                              )

**FILED**

MAY 3 0 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## ORDER

In accordance with the memorandum opinion issued this date, it is hereby

ORDERED that judgment be, and hereby is entered on behalf of the plaintiffs,

Deborah D. Peterson, et al., and Joseph and Marie Boulos, et al., as to all issues of

liability against the defendants, the Islamic Republic of Iran and the Iranian Ministry of

Information and Security.  It is further

ORDERED that all claims for damages in these actions be submitted to Special

1

25/17

Masters to be appointed by this Court.  It is further

ORDERED that, following receipt by this Court of reports from the Special Masters, and in consideration of the findings and evidence presented in those proceedings, the Court will enter judgment as to each claim for compensatory damages. It is further

ORDERED that the Court will take under advisement the issue of imposing an amount in punitive damages against the defendants, pending the entry of judgment as to the amounts of compensatory damages.

SO ORDERED.

Date:  **5-31-03**

Royce C. Lamberth
United States District Judge

2