UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Elizabeth Murphy, individually and as Administratrix of the Estate of Terrence Rich;** <br> **Bryan Harris;** <br> **Armando J. Ybarra;** <br>         and <br> **John E. L'Heureux** <br><br>             Plaintiffs, <br>     v. <br><br> **THE ISLAMIC REPUBLIC OF IRAN** <br>         and <br> **THE IRANIAN MINISTRY OF INFORMATION AND SECURITY** <br><br>             Defendants. | Civil Action No. 1:06CV00596 |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case arises from the October 23, 1983, terrorist attack on the Marine barracks in Beirut, Lebanon. Plaintiffs L'Heureux and Ybarra are members of the United States armed forces who sustained injuries as a result of the aforementioned terrorist attack; plaintiffs Murphy and Harris are the mother and brother of Terrence Rich, who died in the attack, and Mrs. Murphy is the personal representative of her son's estate. Plaintiffs claim that defendants the Islamic Republic of Iran ("Iran") and the Iranian Ministry of Information and Security ("MOIS") are liable for damages resulting from this attack because they provided material support to Hezbollah, a terrorist organization that perpetrated the bombing. Plaintiffs rely on the procedural provisions of the Foreign Sovereign Immunities Act ("FSIA"), *inter alia*, 28 U.S.C. §1605(a)(7), and on state law causes of action.

PROCEDURAL HISTORY

On March 31, 2006, plaintiffs filed a Complaint against defendants Iran and MOIS. Service upon a foreign state or a subdivision thereof is governed by the provisions of 28 U.S.C. §§1608(a)(4) and 1608(c)(1), and Fed.R.Civ.P. 4. On January 7, 2007 (docket no. 17), service on the defendants was effected via diplomatic channels, as prescribed by 28 U.S.C. §1608. Defendants failed to answer or otherwise respond to the Complaint. Accordingly, upon affidavit filed on behalf of plaintiffs, the Clerk of this Court entered default against the defendants on August 9, 2007. Plaintiffs' liability claims are supported by this Court's findings and conclusions made in *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46 (D.D.C. 2003) (Lamberth, J.), an action brought against the same defendants for damages arising out of the same 1983 attack on the Marine barracks in Beirut, Lebanon. As this Court recently noted, "'[ a] court may take judicial notice of related proceedings and records in cases before the same court.'" *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 262-63 (D.D.C. Dec. 22, 2006) (Lamberth, J.) (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 109 n.6 (D.D.C. 2005) (Bates, J.) Accordingly, this Court will take judicial notice of the findings and conclusions established previously in *Peterson* as to the defendants' involvement in and liability for the attack at issue. Pursuant to Rule 201 of the Federal Rules of Evidence, a court may, at its discretion, take judicial notice of adjudicative facts that are capable of accurate and ready determination and are not subject to reasonable dispute. Fed. R. Evid. 201. A court may do so at any stage in the judicial proceeding. Fed. R. Evid. 201(f).

The Court will consider the reports of one or more special masters, who are expected to issue reports and recommendations based on evidence adduced as to each plaintiff, and plaintiff Murphy's decedent, to establish that the October 23, 1983 terrorist attack was the proximate

cause of the injuries of which they complain, and to enter a final judgment.

## FINDINGS OF FACT

1. On the morning of October 23, 1983, members of Hezbollah ambushed a water delivery truck, scheduled to conduct routine delivery at the Beirut International Airport, which was located near the U.S. Marine barracks in Beirut, Lebanon.

2. In place of the real truck, a separate 19-ton truck was disguised so that it would resemble the hijacked water delivery truck. This fake delivery truck was modified so that it could transport an explosive device. This fake delivery truck set out for the U.S. Marine barracks, driven by Ismalal Ascari, an Iranian.

3. At approximately 6:25 a.m., Beirut time, the truck circled past the barracks, increased its speed, then proceeded to crash through a barbed wire barrier and a wall of sandbags, entering the barracks. When the truck reached the center of the barracks, the bomb in the truck detonated.

4. What resulted was the largest non-nuclear explosion ever detonated up to that time. The explosion caused severe damage over half a mile away. It created a crater in the ground over eight feet deep, and reduced the four-story Marine barracks to a pile of rubble.

5. FBI forensic investigators testified that the force of the explosion was equivalent to a force of between 15,000 and 21,000 pounds of TNT.

6. The explosion at the Marine barracks killed 241 servicemen, and caused many others to suffer severe injuries.

7. The U.S. Marine service members who were present at the time of the attack in Beirut possessed neither combatant nor police powers. Each of the service members was a non-combatant operating under peacetime rules of engagement.

8. The attack on the U.S. Marine barracks was orchestrated and carried out by members of Hezbollah, an organization whose primary objective is to engage in terrorist activities.

9. The formation and emergence of Hezbollah as a major terrorist organization is substantially the work of the government of Iran.

10. The Islamic Republic of Iran provided material support and assistance in orchestrating the 1983 attack on the U.S. Marine barracks in Beirut.

11. Dr. Patrick Clawson, a renowned expert on Iranian affairs, testified that at the time of the attack in 1983, Hezbollah was a creature of the Iranian government, acting almost entirely "under the order of the Iranians and being financed almost entirely by the Iranians."

12. Dr. Reuven Paz, the director of the Project for the Research of Islamist Movements and senior research fellow at The International Policy Institute for Counterterrorism, agrees with Dr. Clawson's testimony, having. testified that, at the time of the attack on the u.s. Marine barracks, Hezbollah "was totally controlled by Iran and actually served mainly the Iranian interest in Lebanon and [ against] Israel." Dr. Paz further testified that there is no way that Hezbollah "could have carried out such an attack [on the U.S. Marine barracks] without Iranian training, without Iranian-Iranian supply of the explosives even, and without directions trom the Iranian forces in Lebanon itself."

13. MOIS acted as a conduit for Iran's provision of funds and explosives to Hezbollah and, at all times relevant to these proceedings, exercised operational control over Hezbollah.

14. As Dr. Clawson testified, in light of the complex and significant nature of the 1983 attack on the U.S. Marine barracks, the attack itself would have been impossible without the express approval of Iranian government leaders at the highest level.

CONCLUSIONS OF LAW

I. Legal Standard for FSIA Default Judgment

Under the Foreign Sovereign Immunities Act, "[n]o judgement by default shall be entered by a court of the United States or of a state against a foreign state. . . unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 US.C. §l608(e); *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232-33 (D.C. Cir. 2003), *cert. denied*, 542 U.S. 915 (2004). In default judgment cases, plaintiffs may present evidence in the form of affidavits. *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74,82 (D.D.C. Mar. 29, 2006) (quoting *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) (Urbina, J.)). Upon evaluation, the court may accept plaintiffs' uncontroverted evidence as true. *Campuzano*, 281 F. Supp. 2d at 268.

II. Jurisdiction

In the United States, the Foreign Sovereign Immunities Act ("FSIA") provides the sole basis for asserting jurisdiction over foreign sovereigns. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434-34 (1989); see also 28 U.S.C. §1602, *et seq*. Under the FSIA, a party may not bring an action for money damages in United States courts against a foreign state, unless an exception to jurisdictional immunity is found under 28 US.C. §1605.[1] Under the FSIA's "state-sponsored terrorism" exception, a foreign state may be subject to suits for money damages brought in U.S. courts where plaintiffs bring claims for "personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the

---

[1] 28 U.S.C. §1604. Though Section 1604 also states that an exception to a foreign state's immunity can be found under 28 U.S.C. §1607, that provision governs counterclaims brought by a foreign state, which are not at issue here because the defendants have not made an appearance, let alone filed a counterclaim. See 28 U.S.C. §1607. Accordingly, this Court will limit the scope of its inquiry to the exceptions available under 28 U.S.C. §1605.

provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment or agency."

Accordingly, in order to subject a foreign sovereign to suit under section 1605(a)(7), plaintiffs must show that: (1) the foreign sovereign was designated by the State Department as a "state sponsor of terrorism"; (2) the victim or plaintiff was a U.S. national at the time the acts took place; and (3) the foreign sovereign engaged in conduct enumerated within the statute. *Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 158 (D.D.C. Mar. 28, 2006) (Lamberth, J.). In this case, plaintiffs allege that the deaths and injuries sustained by plaintiffs arose out of and were caused by the extrajudicial killing of the deceased serviceman whose estate is represented in this action, and extrajudicial infliction of bodily injury on the surviving plaintiffs.

Each of the requirements under Section 1605(a)(7) are met in this case as to each defendant.[2] First, Iran has been designated a state sponsor of terrorism continuously since January 19, 1984. *See* 31 C.F.R. §596.201 (2001); *Flatow*, 999 F. Supp. at 11, 19. Though Iran was not designated as a state sponsor of terrorism on the date of the attack at issue, its designation as such shortly thereafter was due in part to their assistance in perpetrating this attack, and therefore satisfies the requirements of Section 1605. *See Prevatt*, 421 F. Supp. 2d at 158. Second, as posited in their pleadings, each of the victims was a United States national at the time of the attack. Finally, defendants engaged in conduct that squarely falls within the ambit of Section 1605(a)(7) because it provided material support and resources to Hezbollah in order to

---

[2] Defendant MOIS is considered to be a division of state of Iran, and thus the same detenninations apply to its conduct as apply to Iran's conduct. *Roeder*, 333 F.3d at 234.

facilitate the extrajudicial killing of American servicemen.[3]

Personal jurisdiction over a non-immune foreign sovereign exists so long as service of process has been made under Section 1608 of the FSIA. *Prevatt*, 421 F. Supp. 2d at 158; *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286,298 (D.D.C. 2003) (Lamberth, J.). Such service has been made in this case, therefore this Court may exercise personal jurisdiction over the defendants.

III. Liability

A. Proper Cause of Action under FSIA

Once a foreign state's immunity has been lifted under Section 1605, plaintiffs must state a proper cause of action against defendants under federal, state or international law.[4] To the extent that a valid cause of action is pleaded under one of these sources of law, 28 U.S.C. §1606 provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. §1606. Section 1606 acts as a "pass-through" to substantive causes of action against private individuals that may exist in federal, state or international law. *Prevatt*, 421 F. Supp. 2d at 158 (citing *Dammarell v. Islamic Republic of*

---

[3] As this Court noted in *Peterson*, "[t]he [FSIA] utilizes the same definition of "extrajudicial killing" as the Torture Victim Protection Act of 1991, which defines an 'extrajudicial killing' as 'a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all judicial guarantees which are recognized as indispensable by civilized peoples. . . .' Pub. L. 102-256, 106 Stat. 73 (1992). The Court concludes that the act undertaken by agents of Hezbollah-the development and detonation of an explosive charge in the barracks of the 24th MAD on October 23, 1983, which resulted in the deaths of over 241 peacekeeping American servicemen-satisfies the [FSIA's] definition of an 'extrajudicial killing.'" *Peterson*, 264 F. Supp. 2d at 61.

[4] *See Cicippio-Puleo v. Islamic Republic of Iran,* 353 F.3d 1024,1034 (D.C. Cir. 2004) (holding that 28 U.S.C. §1605(a)(7) merely removes a foreign state's immunity from jurisdiction in federal courts, and does not affirmatively create a cause of action).

*Iran*, Civ. A. No. 01-2224, 2005 WL 756090, at *8-10, 2005 U.S. Dist. LEXIS 5343, at *27-32 (D.D.C. Mar. 29, 2005) (Bates, J.)). In this case, state tort law provides a basis for liability. First, the law of the United States governs this dispute, as opposed the law of the place where the alleged tort occurred, or any other foreign law, due to the fact that, in cases involving terrorist attacks against United States citizens, the United States has a "unique interest" in having its domestic law apply in cases involving terrorist attacks on United States citizens. *See Dammarell*, 2005 WL 756090, at *20, 2005 U.S. Dist. LEXIS 5343, at *63.

  Second, having established that the laws of the United States apply in this action, the Court must determine the applicable state law to govern the action. As the forum state, District of Columbia choice of law rules apply to determine which state's law shall apply. *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 54 (D.D.C. Sept. 29, 2006) (Lamberth, J.). Under District of Columbia choice of law rules, courts employ a modified government interest analysis under which they "evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31, 41 (D.C. 1989) (citations and internal quotations omitted). In general, this governmental interest test tends to point to the law of plaintiff's domicile as having the greatest interest in providing redress to its citizens. *Blais*, 459 F. Supp. 2d at 54 (citing *Dammarell*, 2005 WL 756090, at *20-21, 2005 U.S. Dist. LEXIS 5343, at *66-67 (citing RESTATEMENT (THIRD) FOREIGN RELATIONS LAW §402(3) (1987))). Accordingly, plaintiffs' claims shall be governed by the law of the state in which each was domiciled at the time of the attack in 1983.

  Third, as required by 28 U.S.C. §1606, the Court must decide whether the appropriate state's law provides a cause of action for the claims at issue. Plaintiffs have represented that they

were domiciled in the following states and/or territories at the time of the attack: Massachustts, New York, North Carolina, and Texas. Plaintiffs have brought various claims against the defendants for wrongful death, survival, intentional infliction of emotional distress, battery, and assault. Each of these jurisdictions provides a cause of action sought by the plaintiffs. The Court must next determine whether each plaintiff has shown liability and damages for these claims under the laws of their respective domiciliary states at the time of the attack.

B. Vicarious Liability

The basis of defendants' liability is that they provided material support and resources to Hezbollah, which personally completed the attack. One may be liable for the acts of another under theories of vicarious liability, such as conspiracy, aiding and abetting and inducement.[5]

This Court finds that civil conspiracy provides a basis of liability for Iran and MOIS. The Court has examined the laws of each of the domiciliary states to determine whether such a basis for a cause of action may be brought in each state under a civil conspiracy theory of liability. Each recognizes civil conspiracy as a theory of liability.[6] Though the elements are pleaded somewhat differently across each state, the essential elements of civil conspiracy are recognized in each state met if it can be demonstrated that: (1) there is an agreement between two or more persons or entities; (2) to do an unlawful act, or an otherwise lawful act by unlawful means; (3) there was an overt act committed in furtherance of this unlawful agreement; and (4) damages

---

[5] Therefore, the Court declines to reach the issue of whether the defendants might also be liable on the basis of aiding and abetting and/or inducement.

[6] See 4 Causes of Action 2d 517, §2 (2006). In most states, civil conspiracy is not recognized as an independent tort, but rather as a basis for liability arising out of a separate tort. See id. at §2. This distinction does not affect the outcome of this case, however, as none of the plaintiffs have brought a specific claim against the defendants for civil conspiracy.

were incurred by the plaintiff as a proximate result of the actions taken pursuant to the conspiracy. See *Heiser*, 466 F. Supp. 2d at 266-67.

Here, there is evidence that the defendants, along with Hezbollah, agreed to commit the attack on the barracks. *See Peterson*, 264 F. Supp. 2d at 54-56. The defendants provided material support and resources to Hezbollah to commit this attack, engaging in numerous overt acts in furtherance of this unlawful agreement. Id. Finally, the deceased servicemen and their survivors clearly suffered both physical and mental pain and anguish as a direct result of the attack on the barracks. Therefore, the elements of civil conspiracy are established between the defendants in this case and the actual perpetrators of the attack.

C. Pain and Suffering Damages

Plaintiffs have alleged claims in which an essential element is the proof of severe mental anguish, loss of society, and extreme pain and suffering. The loss of a loved one will never truly be forgotten. However, the loss of a loved one in such a horrific and inhumane manner can only further embed the intense feelings of pain and suffering such that the immense grief these surviving family members experience will never be erased. Therefore, this Court finds that the deaths of the American servicemen have caused their surviving spouses, parents, children, and siblings to suffer severe mental anguish, extreme pain and suffering, and loss of society, and that these surviving family members will continue to suffer, in light of the severity of both the physical and psychological nature of this attack.

D. Individual Plaintiffs' Claims for Liability and Damages

In light of the evidence presented at trial and the factual and legal conclusions set forth in

*Peterson v. Islamic Republic of Iran*, the Court finds that the plaintiffs have established by clear and convincing evidence that defendants Islamic Republic of Iran, and the Iranian Ministry of Information and Security (MOIS) are responsible for and the cause of the 1983 attack on the U.S. Marine barracks in Beirut. The Court must now determine whether the individual claims of plaintiffs against the defendants warrant the entry of final judgments against defendants. The Court will defer this determination until plaintiffs have submitted evidence to the special masters appointed in this matter, and the latter have rendered their reports and recommendations. At that time, the Court will determine the proper amount of damages and content of final judgments with respect to each plaintiff.

_____
United States District Judge