# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|                                          |     |                    |
|------------------------------------------|-----|--------------------|
| ELIZABETH MURPHY, et al.,                | )   |                    |
|                                          | )   |                    |
|     Plaintiffs,      | )   |                    |
|                                          | )   |                    |
|     v.               | )   | 06-cv-596 (RCL)    |
|                                          | )   |                    |
| ISLAMIC REPUBLIC OF IRAN, et al.,        | )   |                    |
|                                          | )   |                    |
|     Defendants.      | )   |                    |
|                                          | )   |                    |

## MEMORANDUM OPINION

## I.    Introduction.

This case arises out of the October 23, 1983, bombing of the United States Marine barracks in Beirut, Lebanon ("the Beirut bombing"), where a suicide bomber murdered 241 American military servicemen in the most deadly state-sponsored terrorist attack upon Americans until the tragic attacks on September 11, 2001.  The Court will first discuss the background of this case: the commencement of this case by plaintiffs, the later inclusion of plaintiffs in intervention, the retroactive application of recent changes to the Foreign Sovereign Immunities Act (FSIA), the judicial notice taken of findings and conclusions made in a related case, the entry of default judgment, and a summary of the claims made in this case.  Second, the Court will make findings of fact.  Third, the Court will discuss the Court's personal and subject-matter jurisdiction.  Fourth, the Court will discuss defendants' liability under the federal cause of action created by the Foreign Sovereign Immunities Act.  Finally, the Court will award compensatory and punitive damages as appropriate.

## II.    Background.

This case contains two complaints: one by the plaintiffs, the other by the plaintiffs in intervention (also referred to as "intervenor plaintiffs" or "intervenors").  The terrorism exception to the FSIA, as recently amended, applies retroactively to claims made by both plaintiffs and intervenors.  The Court has taken judicial notice of the findings and conclusions entered in a related case.  The Court will enter default judgment against defendants and in favor of all plaintiffs and intervenors.  Plaintiffs and intervenors have brought various claims of wrongful death, assault, battery, and intentional infliction of emotional distress (IIED), for which they seek compensatory and punitive damages.

### A.    Retroactive Application of Recently Amended Provisions of the FSIA to Plaintiffs and Intervenors.

Plaintiffs originally brought this action against defendants under 28 U.S.C. § 1605(a)(7), the former state-sponsor-of-terrorism exception to the general rule of sovereign immunity enumerated in the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602–1611. *See* Compl., Mar. 31, 2006, ECF No. 1.  Section 1605(a)(7) "was 'merely a jurisdiction conferring provision,' and therefore did not create an independent federal cause of action against a foreign state or its agents." *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31 (D.D.C. 2009) (Lamberth, J.) (quoting *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1027, 1032 (D.C. Cir. 2007)).  It merely opened the door to plaintiffs seeking to bring suit in federal court against foreign sovereigns for terrorism-related claims, which had to be based on state tort law.  *Id.* at 40–48 (providing a historical overview of the FSIA terrorism exception) Further, the FSIA did not permit the awarding of punitive damages against foreign states themselves.  *Id.* at 48.

This case comes to the Court following final judgment in *Peterson v. Islamic Republic of Iran.  See Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007) (Lamberth, J.) [hereinafter *Peterson II*] (final judgment); *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46 (D.D.C. 2003) (Lamberth, J.) [hereinafter *Peterson I*] (default judgment).  *Peterson* established the liability of Iran and MOIS in the terrorist attack out of which this case also arise, but did so under § 1605(a)(7), thus reaching "inconsistent and varied result[s]" when various states' tort laws differed.  *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 59; Congress responded to this inconsistency and the unavailability of punitive damages by replacing § 1605(a)(7) with § 1605A, a new terrorism exception that provides an independent federal cause of action and makes punitive damages available to plaintiffs.  *See In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 58–61 (discussing repeal of § 1605(a)(7) and enactment of § 1605A).  Plaintiffs now seek to retroactively take advantage of these changes.  As do plaintiffs in intervention; Intervenors filed their complaint in intervention stating claims only under § 1605A, but they too must satisfy certain procedural requirements to take advantage of § 1605A, enacted in 2008, to the Beirut Bombing, which occurred in 1983.

Parties seeking to take advantage of this new federal cause of action and punitive-damages allowance must proceed under one of three procedural approaches, which are laid out in part in the National Defense Authorization Act for Fiscal Year 2008 (2008 NDAA), Pub. L. No. 110-181, § 1083(2)–(3), 112 Stat. 3, 342–43 (2008).  *See generally In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 62–65).  These three approaches are prior actions, related actions, or stand-alone actions.

First, § 1605A may apply to a "prior action," which is one that (1) "was brought under section 1605(a)(7) of title 28, United States Code . . . before the date of the enactment of this

Act," the 2008 NDAA, January 28, 2008, § 1083(c)(2)(A)(i); (2) "relied upon . . . such provision as creating a cause of action," § 1083(c)(2)(A)(ii); (3) "has been adversely affected on the grounds that [such] provision[] fail[ed] to create a cause of action against the state," § 1083(c)(2)(A)(iii); and (4) "as of such date of enactment, [was] before the courts in any form," § 1083(c)(2)(A)(iv). Second and alternatively, § 1605A may apply to a "related action," which is one "arising out of the same act or incident" as "an action arising out of an act or incident [that] has been timely commenced under section 1605(a)(7) of title 28, United States Code." § 1083(c)(3). Third and finally, potential plaintiffs may pursue a stand-alone action, which is one in which § 1605A need not retroactively apply to some past attack. Plaintiffs and intervenors in this case proceed under the second approach. This case is related to, among other cases, *Valore v. Islamic Republic of Iran*, a consolidation of four cases, all of which were timely commenced under § 1605(a)(7) and which arose out of the same act or incident as this case: the Beirut Bombing. *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 57 (D.D.C. 2010) (Lamberth, C.J.) ("All plaintiffs in this case originally brought their individual actions against defendants under 28 U.S.C. § 1605(a)(7) . . . .").

To secure retroactive application of § 1605A, a party in a related action must seek such retroactivity "not later than the latter of 60 days after the date of the entry of judgment in the original action"—the one to which the related action is related—or January 28, 2008—the date of the enactment of the 2008 NDAA. § 1083(c)(3). Plaintiffs sought retroactive application through their Motion for Leave to Amend Complaint, ECF No. 46, which was filed on February 26, 2010. Plaintiffs in intervention sought retroactive application by filing their Complaint in Intervention, ECF No. 31, on November 17, 2008. Final judgment in *Valore* was entered on March 31, 2010. *See* Order & J., *Valore*, No. 03-cv-1959 (D.D.C. Mar. 31, 2010), ECF No. 60.

Both plaintiffs and intervenors therefore commenced their respective portions of this action well before 60 days after the entry of final judgment in *Valore*. The Court may therefore apply § 1605A to all claims in this case, and has allowed plaintiffs to amend their complaint and intervenors to intervene. Order Granting Mot. for Leave to Am. Compl., Apr. 13, 2010, ECF No. 52; Order, Nov. 17, 2008, ECF No. 30; *see* Am. Compl. for Dam., Apr. 13, 2010, ECF No. 54 [hereinafter Pls.' Compl.]; Compl. in Intervention, Nov. 17, 2008, ECF No. 30 [hereinafter Ints.' Compl.].

### B.     Judicial Notice and Default Judgment.

The Court has taken judicial notice of the findings of fact and conclusions of law made in *Peterson*, which also arose out of the Beirut Bombing; in the orders taking such notice, the Court also issued default judgments against both defendants, which failed to appear. Order Granting in Part and Finding as Moot in Part Mot. for Judicial Notice of Findings of Fact and Conclusions of Law on Liability of Defs., Apr. 13, 2010, ECF No. 53; Order, Oct. 2, 2007, ECF No. 27. Plaintiffs and intervenors had both established their right to relief "by evidence satisfactory to the court," 28 U.S.C. § 1608(e), through "uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence," *Int'l Road Fed'n v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 252 n.4 (D.D.C. 2001) (quotation omitted).

A court may take judicial notice of any fact "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Under Rule 201(b), courts generally may take judicial notice of court records. *See* 21B Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5106.4; *see also Booth v. Fletcher*, 101 F.2d 676, 679 n.2 (D.C. Cir. 1938) ("A court may take judicial notice of, and give effect to, its own records in another but

interrelated proceeding . . . .").  Indeed, as has been noted in several other FSIA cases brought in this District, "this Court 'may take judicial notice of related proceedings and records in cases before the same court.'"  *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 50–51 (D.D.C. 2009) (quoting *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d. 229, 267 (D.D.C. 2006) (Lamberth, J.) [hereinafter *Heiser I*]).  At issue is the effect of such notice.

Although a court clearly may judicially notice its findings of facts and conclusions of law in related cases, this Circuit has not directly considered whether and under what circumstances a court may judicially notice the *truth* of such findings and conclusions.  Circuits that have addressed this question have concluded that "courts generally cannot take notice of findings of fact from other proceedings for the truth asserted therein because these are disputable and usually are disputed"; but because "it is conceivable that a finding of fact may satisfy the indisputability requirement," these courts have not adopted a per se rule against such notice.  *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 829–30 (5th Cir. 1998); *see also Wyatt v. Terhune*, 315 F.3d 1108, 1114 n.5 (9th Cir. 2003); *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F. 3d 66, 70 (2d Cir. 1998); *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1082 n.6 (7th Cir. 1997); *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994); *Holloway v. Lockhart*, 813 F.2d 874, 878–79 (8th Cir. 1987).  *See generally* 21B Wright & Graham, *supra*, § 5106.4 ("While judicial findings of fact may be more reliable than other facts found in the file, this does not make them indisputable . . . .").

This District has followed a similar approach in FSIA cases: judicial notice of the truth of findings and conclusions is not prohibited per se, but is inappropriate absent some particular indicia of indisputability.  Here, there are no such indicia.  With "defendants having failed to enter an appearance," *Peterson* was decided without the full benefits of adversarial litigation, and

its findings thus lack the absolute certainty with which they might otherwise be afforded.

*Peterson I*, 264 F. Supp. 2d at 49. Just as "findings of fact made during this type of one-sided hearing should not be given a preclusive effect," *Weinstein v. Islamic Republic of Iran*, 175 F. Supp. 2d 13, 20 (D.D.C. 2001) (Lamberth, J.), they also should not be assumed true beyond reasonable dispute. Moreover, because "default judgments under the FSIA require additional findings than in the case of ordinary default judgments," *id.* at 19–20, the court should endeavor to make such additional findings in each case.

The taking of judicial notice of the *Peterson* opinion, therefore, does not conclusively establish the facts found in *Peterson* for, or the liability of the defendants in, this case. But "the FSIA does not require this Court to relitigate issues that have already been settled" in previous decisions. *Brewer*, 664 F. Supp. 2d at 54. Instead, the Court may review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence. *Heiser I*, 466 F. Supp. 2d at 264 (reconsidering evidence presented in *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (2006) (Lamberth, J.)). In rendering default judgment against defendants, the Court was therefore required to, and did, find facts and make legal conclusions anew. Below, the Court expounds on those findings and conclusions.

**C.     Summary of Plaintiffs' and Intervenors' Claims.**

Servicemen Armando Ybarra and John L'Heureux who survived the attack have brought claims of assault, battery, and intentional infliction of emotional distress, seeking damages for pain and suffering and economic losses. The estates of one serviceman killed in the attack— Terrance Rick ("decedent"), represented by Elizabeth Murphy—has brought a claim for wrongful death, seeking to recover decedent's lost wages and earnings. Finally, family members of servicemen-victims—Elizabeth Murphy, Bryan Harris, Mary E. Wells, Kerry M. L'Heureux,

and Jane L. L'Heureux—have brought claims for intentional infliction of emotional distress,

seeking solatium. Armando Ybarra and John L'Heureux have also sought punitive damages.

## III. Facts.

Based on plaintiffs' and intervenors' uncontroverted factual assertions in their complaints

and with due reference to facts found in *Peterson*, the Court finds the following:

### A. The Relationship Between Hezbollah and Iran.

In late 1982 [during the Lebanese Civil War], with the concurrence of the United Nations, a multinational peacekeeping coalition consisting of American, British, French, and Italian soldiers arrived in the Lebanese capital of Beirut. In May of 1983, the 24th Marine Amphibious Unit of the U.S. Marines ("the 24th MAU") joined this coalition.
. . . .
Following the 1979 revolution spearheaded by the Ayatollah Ruhollah Khomeini, the nation of Iran was transformed into an Islamic theocracy. . . . The post-revolutionary government in Iran . . . declared its commitment to spread the goals of the 1979 revolution to other nations. Towards that end, between 1983 and 1988, the government of Iran spent approximately $50 to $150 million financing terrorist organizations in the Near East. One of the nations to which the Iranian government directed its attention was the war-torn republic of Lebanon.
"Hezbollah" is an Arabic word meaning "the party of God." It is also the name of a group of Shi'ite Muslims in Lebanon that was formed under the auspices of the government of Iran. Hezbollah began its existence as a faction within a group of moderate Lebanese Shi'ites known as Amal. Following the 1982 Israeli invasion of Lebanon, the Iranian government sought to radicalize the Lebanese Shi'ite community, and encouraged Hezbollah to split from Amal. Having established the existence of Hezbollah as a separate entity, the government of Iran framed the primary objective of Hezbollah: to engage in terrorist activities in furtherance of the transformation of Lebanon into an Islamic theocracy modeled after Iran.

*Peterson I*, 264 F. Supp. 2d at 49–51 (footnotes omitted).

During the *Peterson* trial, several experts testified on Iran's terrorist activities. Patrick

Clawson, Ph.D., "a widely-renowned expert on Iranian affairs," testified that in 1983, Hezbollah

was "a creature of the Iranian government." *Id.* at 51. According to Dr. Clawson:

Both from the accounts of Hezbollah members and from the accounts of the Iranians and of every academic study that I'm aware of, certainly at this time,

Hezbollah is largely under Iranian orders.  It's almost entirely acting . . . under the order of the Iranians and being financed almost entirely by the Iranians.

*Id.*  Dr. Clawson's testimony was corroborated by that of Michael Ledeen, Ph.D., "a consultant to the Department of Defense at the time of the Marine barracks bombing and an expert on U.S. foreign relations, [who] testified at trial that 'Iran invented, created, funded, trained, and runs to this day Hezbollah, which is arguably the world's most dangerous terrorist organization.'"  *Id.* at 51 n.8.  Dr. Clawson's testimony was further corroborated by Reuven Paz, Ph.D., "who has researched Islamic groups for the last 25 years" and who testified at trial that Hezbollah "totally relied upon . . . Iranian support" and that at the time of the Beirut bombing, "when Hezbollah was not yet formed as a strong group, it was totally controlled by Iran and actually served mainly the Iranian interest in Lebanon."  *Id.* at 52.  Dr. Paz testified further that Hezbollah could not have carried out the Beirut bombing "without Iranian training, without . . . Iranian supply of the explosives . . . , and without directions from the Iranian forces in Lebanon itself."  *Id.*

> It is clear that the formation and emergence of Hezbollah as a major terrorist organization is due to the government of Iran.  Hezbollah . . . receive[d] extensive financial and military technical support from Iran, which funds and supports terrorist activities.  The primary agency through which the Iranian government both established and exercised operational control over Hezbollah was the Iranian Ministry of Information and Security ("MOIS").  MOIS had formerly served as the secret police of the Shah of Iran prior to his overthrow in 1979.  Despite the revolutionary government's complete break with the old regime, it did not disband MOIS, but instead allowed it to continue its operations as the intelligence organization of the new government. . . . MOIS acted as a conduit for the Islamic Republic of Iran's provision of funds to Hezbollah, provided explosives to Hezbollah and, at all times relevant to these proceedings, exercised operational control over Hezbollah.

*Id.* at 53.  *See generally* Council on Foreign Relations, *Hezbollah (a.k.a. Hizbollah, Hizbu'llah)* (July 15, 2010), http://www.cfr.org/publication/9155 ("[Hezbollah] has close links to Iran . . . .");

Council on Foreign Relations, *State Sponsors: Iran* (Aug. 2007), http://www.cfr.org/publication/

9362 ("Iran mostly backs Islamist groups, including the Lebanese Shiite militants of

Hezbollah . . . .").

> It is clear that MOIS was no rogue agency acting outside of the control
> and authority of the Iranian government. . . . [T]he October 23 attack would have
> been impossible without the express approval of Iranian government leaders at the
> highest level . . . .
>     . . . .
> The approval of the ayatollah and the prime minister was absolutely
> necessary to carry out the continuing economic commitment of Iran to Hezbollah,
> and to execute the October 23 attack. Given their positions of authority, any act of
> these two officials must be deemed an act of the government of Iran.

*Peterson I*, 264 F. Supp. 2d at 52–53 (footnotes omitted). As Dr. Clawson testified, approval for

the attack could only come after "a discussion in the National Security Council which would

involve the prime minister, and it would also have required the approval of Iran's supreme

religious leader, Ayatollah Khomeini." *Id.* at 53; *see also* Anthony H. Cordesman & Martin

Kleiber, Ctr. for Strategic & Int'l Studies, *Iran's Military Forces and Warfighting Capabilities*

131 (2007) (noting that MOIS is funded by Iran with "a comparatively large budget" and

"operates under the broader guidance of Ali Khamenei").

### B.     The Beirut Bombing.

> The complicity of Iran in the 1983 attack was established
> conclusively . . . [by a] message [that] had been sent from MOIS to [the] Iranian
> ambassador to Syria . . . . The message directed the Iranian ambassador to
> contact . . . the leader of the terrorist group Islamic Amal, and to instruct him to
> have his group instigate attacks against the multinational coalition in Lebanon,
> and "to take a spectacular action against the United States Marines."
>     . . . .
> Hezbollah members formed a plan to carry out simultaneous attacks
> against the American and French barracks in Lebanon.
>     . . . .
> [A] 19-ton truck was disguised so that it would resemble a water[-]
> delivery truck that routinely arrived at the Beirut International Airport, which was
> located near the U.S. Marine barracks in Beirut, and modified the truck so that it
> could transport an explosive device. On the morning of October 23, 1983,
> members of Hezbollah ambushed the real water delivery truck before it arrived at

the barracks.  An observer was placed on a hill near the barracks to monitor the operation.  The fake water delivery truck then set out for the barracks . . . .

At approximately 6:25 a.m. Beirut time, the truck drove past the Marine barracks.  As the truck circled in the large parking lot behind the barracks, it increased its speed.  The truck crashed through a concertina wire barrier and a wall of sandbags, and entered the barracks.  When the truck reached the center of the barracks, the bomb in the truck detonated.

The resulting explosion was the largest non-nuclear explosion that had ever been detonated on the face of the Earth.  The force of its impact ripped locked doors from their doorjambs at the nearest building, which was 256 feet away.  Trees located 370 feet away were shredded and completely exfoliated.  At the traffic control tower of the Beirut International Airport, over half a mile away, all of the windows shattered. . . . The explosion created a crater in the earth over eight feet deep.  The four-story Marine barracks was reduced to fifteen feet of rubble.

*Peterson I*, 264 F. Supp. 2d at 54–58 (footnotes omitted).

"As a result of the Marine barracks explosion, 241 servicemen were killed, and many others suffered severe injuries."  *Id.* at 58.  In the immediate aftermath of the explosion, those who could "ran to the rubble and started searching for survivors among the loose hands, heads, legs, arms, and torsos that littered the ruble-strewn ground."  Eric M. Hammel, *The Root: The Marines in Beirut, August 1982–February 1984*, at 330 (1985).  In the remains of the barracks, "[h]uge blocks of steel-laced concrete angled in all directions" where "twisted corpses dangled from the cracks."  *Id.* at 352.  Many of those who survived "had shredded skin adhering to their lower legs and feet . . . caused by the force of the blast."  *Id.* at 351.  The Court need not expand further on the gruesome detail of this horrific attack; several historians and eyewitnesses have contributed to a rich historical record of the tragedy.[1]

---

[1] For the Marine Corps' official history of the event, see Benis M. Frank, *U.S. Marines in Lebanon: 1982–1984*, at 1–5, 94–105 (1987), available at http://purl.access.gpo.gov/GPO/ LPS98826.  For gripping first-hand accounts, see Glenn E. Dolphin, *24 MAU 1983: A Marine Looks Back at the Peacekeeping Mission to Beirut, Lebanon* 161–90 (2005) and Michael Petit, *Peacekeepers at War: A Marine's Account of the Beirut Catastrophe* 165–98 (1986).  For an excellent combination of eyewitness accounting and historical analysis, including the role of Iran and Hezbollah in the attack and a discussion of the *Peterson* litigation, see Timothy J. Geraghty,

**IV.    Jurisdiction.**

The FSIA "is the sole basis of jurisdiction over foreign states in our courts."  *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 39.  The FSIA concerns both subject-matter jurisdiction and personal jurisdiction.  The Court has both.

**A.    Subject-Matter Jurisdiction.**

Several sections of the FSIA and related statutes set forth several specific requisites that must be satisfied for the Court to have jurisdiction over the subject matter of this case.  These requisites may be broken down into four categories: grant of original jurisdiction, waiver of sovereign immunity, requirement that a claim be heard, and limitations.  Plaintiffs and intervenors have satisfied all subject-matter jurisdictional requisites.

**1.    Grant of Original Jurisdiction.**

The FSIA grants U.S. district courts "original jurisdiction without regard to amount in controversy of any [(1)] nonjury civil action [(2)] against a foreign state . . . [(3)] as to any claim for relief in personam [(4)] with respect to which the foreign state is not entitled to immunity." § 1330(a).  The FSIA defines a foreign state to include any "political subdivision" or "agency or instrumentality" thereof, § 1603(a), and further defines an agency or instrumentality as "any entity (1) which is a separate legal person, corporate or otherwise[,] . . . (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof[;] and (3) which is neither a citizen of a State of the United States . . . nor created under the laws of any third country," § 1603(b).  In interpreting and applying these statutory definitions, this Circuit employs a core-functions test, under which "an entity that is an 'integral part of a foreign state's political

---

*Peacekeepers at War: Beirut 1983—The Marine Commander Tells His Story* 91–121, 181–201 (2009).

structure' is to be treated as the foreign state itself" while an "entity the structure and core function of which are commercial is to be treated as an 'agency or instrumentality' of the state." *TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296, 300 (D.C. Cir. 2005) (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C. Cir. 1994)).

First, no party has sought a jury trial, nor are they entitled to one under the Seventh Amendment in this type of case, *Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil*, 212 F. Supp. 2d 30, 40 (D.D.C. 2002) ("[C]laims under the FSIA are not eligible for resolution by a jury . . . ."). Therefore, this is a nonjury civil action.

Second, plaintiffs and intervenors have instituted this action against Iran and MOIS, both of which are considered to be a foreign state. Iran, of course, is the foreign state itself. "MOIS is considered to be a division of state of Iran, and is treated as a member of the state of Iran itself." *Bennett v. Islamic Republic of Iran*, 507 F. Supp. 2d 117, 125 (citing *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003); *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 116 (D.D.C. 2005)) (Lamberth, J.). In other words, MOIS is a political subdivision of Iran. Therefore, this action is against a foreign state as defined by the FSIA.

Third, as discussed *infra* Part IV.B, the Court has personal jurisdiction over the defendants as legal persons, rather than property. Therefore, this is an action in personam, rather than in rem.

Fourth and finally, as discussed *infra* Part IV.A.2., Iran and MOIS are not entitled to immunity from this suit. Accordingly, because this is a nonjury civil action against a foreign state for relief in personam to which the defendants are not immune, the Court has original jurisdiction over this case.

## 2.      Waiver of Sovereign Immunity.

Under the FSIA, "a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). Because "subject-matter jurisdiction turns on the existence of an exception to foreign sovereign immunity, . . . even if the foreign state does not enter an appearance to assert an immunity defense, a District Court still must determine that immunity is unavailable under the Act." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 495 n.20 (1983). Under the FSIA terrorism exception, sovereign immunity is waived when (1) a foreign state (2) committed "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or [provided] material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency," (3) which "caused" (4) "personal injury or death" (5) for which "money damages are sought." § 1605A(1).

First, plaintiffs and intervenors have brought suit against Iran and MOIS, both of which are considered to be a foreign state. *See* discussion *supra* Part IV.A.1.

Second, plaintiffs and intervenors, in their respective complaints, allege that defendants committed torture, committed extrajudicial killing, and provided material support and resources therefor by providing operational control over and financial and technical assistance to Iranian agents of Hezbollah who constructed, deployed, and exploded the truck bomb, injuring and killing hundreds. Pls.' Compl. ¶ 15; Ints.' Compl. ¶ 9. Plaintiffs and intervenors therefore have sufficiently alleged the commission of acts of torture and extrajudicial killing and the provision of material support and resources therefor by defendants.

Third, concerning causation, "there is no 'but-for' causation requirement" for claims made under the FSIA. *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp 2d at 42. In *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, a case which interpreted the substantially similar § 1605(a)(7) that is now § 1605A, this Circuit noted that in the FSIA, "the words 'but for' simply do not appear; only 'caused by' do." 376 F.3d 1123, 1128 (D.C. Cir. 2004). Adopting the Supreme Court's approach to a different but similarly worded jurisdictional statute, the Circuit interpreted the causation element "to require only a showing of 'proximate cause.'" *Id.* (citing *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536–38 (1995)). "Proximate cause exists so long as there is 'some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered.'" *Brewer*, 664 F. Supp. 2d at 54 (construing causation element in § 1605A by reference to cases decided under § 1605(a)(7)) (quoting *Kilburn*, 376 F.3d at 1128). Here, there are several reasonable alleged connections between the acts of defendants and the injuries suffered by plaintiffs and intervenors: plaintiffs and intervenors allege that Iran's high-level technical participation facilitated the construction and deployment of the bomb so as to maximize its destructive effect, that defendants ordered the attack and oversaw its operation, and that Iran financially supported Hezbollah. Pls.' Compl. ¶¶ 11, 13, 16; Ints.' Compl. ¶¶ 6, 8. Plaintiffs and intervenors therefore have sufficiently alleged causation.

Fourth and fifth, plaintiffs and intervenors allege several instances of personal injury and death for which money damages have been sought. The FSIA does not restrict the personal injury or death element to injury or death suffered directly by the claimant; instead, such injury or death must merely be the bases of a claim for which money damages are sought. § 1605A(1). In this case, plaintiffs and intervenors alleged, of course, the deaths of 241 servicemen and

numerous other physical injuries suffered by those who survived the attack, but also emotional and financial injury to survivors, decedents, decedent's estates, and decedent's family members, for which plaintiffs and intervenors seek millions of dollars in money damages. *See* Pls.' Compl.; Ints.' Compl. Plaintiffs and intervenors have therefore alleged personal injury or death for which money damages have been sought.

Accordingly, because plaintiffs and intervenors have brought suit against a foreign state for acts of torture and extrajudicial killing and the provision of material resources for the same which caused personal injury and death for which money damages have been sought, defendants are not entitled to sovereign immunity.

### 3. Requirement That a Claim Be Heard.

A federal district court "shall hear a claim" under the FSIA terrorism exception when certain conditions are met. § 1605A(2). One such set of conditions applies where (1) "the foreign state was designated as a state sponsor of terrorism at the time the act" giving rise to the claim occurred "or was so designated as a result of such act," § 1605A(a)(2)(A)(i)(I), and, in a related action, "was designated as a state sponsor of terrorism when the . . . related action under section 1605(a)(7) . . . was filed," § 1605A(a)(2)(A)(i)(II); (2) "the claimant or the victim was, at the time the act" giving rise to the claim, "a national of the United States[,] a member of the armed forces[,] or otherwise an employee of the Government of the United States[] or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment," § 1605A(a)(2)(A)(ii); and (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration," § 1605A(a)(2)(A)(iii). The FSIA elaborates on the first

element by defining "state sponsor of terrorism" to mean "a country the government of which the Secretary of State has determined . . . is a government that has repeatedly provided support for acts of international terrorism," § 1605A(h)(6), and the second by defining "national of the United States" to mean "a citizen of the United States[] or . . . a person who, though not a citizen of the United States, owes permanent allegiance to the United States," 8 U.S.C. § 1101(22); § 1605A(h)(5).

First, concerning designation as a state sponsor of terrorism, Iran was so designated by the Secretary of State in partial response to the Beirut bombing. U.S. Dep't of State, Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran, 49 Fed. Reg. 2836, Jan. 23, 1984 (designating Iran as a state sponsor of terrorism for the first time upon concluding that "Iran is a country which has repeatedly provided support for acts of international terrorism"). Iran also remained so designated when the action to which this case is related— *Valore*—was filed in 2003. *See* U.S. Dep't of State, *Patterns of Global Terrorism 2003*, at 86 (2004), *available at* http://www.state.gov/documents/organization/31912.pdf. The requirements of § 1605A(a)(2)(A)(i) are therefore satisfied.

Second, concerning claimants and victims, the Court identifies victims as those who suffered injury or died as a result of the attack and claimants as those whose claims arise out of those injuries or deaths but who might not be victims themselves. In this case, victims include the 241 members of the U.S. armed forces who were killed, the many more who were physically and emotionally injured, and the family members alleging injury suffered from intentional infliction of emotional distress, all of whom are nationals of the United States. Claimants include the same groups or the estates thereof. The requirements of § 1605A(a)(2)(A)(ii) are therefore satisfied.

Third and finally, because the Beirut bombing occurred in Lebanon, not the defendant-state, the arbitration requirements of § 1605A(a)(2)(A)(iii) do not apply.

Accordingly, because Iran was designated a state sponsor of terror by the U.S. State Department as a partial result of the Beirut bombing and remained so designated when a case related to this one was filed; all victims and claimants were or are members of the U.S. armed forces, U.S. nationals, or the estates thereof; and arbitration need not be attempted, the Court is required by the FSIA to hear plaintiffs' claims.

### 4. Limitations.

All cases brought under § 1605A face a 10-year limitations period. § 1605A(b). For a related action, the action to which the related action is related must have been "commenced under section 1605(a)(7) . . . not later than the latter of 10 years after April 24, 1996, or 10 years after the date on which the cause of action arose." § 1605A(b). The action to which this action is related—*Valore*—was commenced in 2003, well within the 10-year period after April 24, 1996. Accordingly, plaintiffs and intervenors satisfy the 10-year limitations period.

### 5. Conclusions Concerning Subject-Matter Jurisdiction.

First, these cases are nonjury civil actions against a foreign state for relief in personam to which the defendants are not immune. The Court therefore has original jurisdiction over these cases. Second, plaintiffs have brought suit against a foreign state for acts of torture and extrajudicial killing and the provision of material resources for the same which caused personal injury and death for which money damages have been sought. Defendants are therefore not entitled to sovereign immunity. Third, Iran was designated a state sponsor of terror by the U.S. State Department as a partial result of the Beirut bombing and remained so designated when cases related to this one were filed; all victims and claimants were or are members of the U.S.

armed forces, U.S. nationals, or the estates thereof; and arbitration need not be attempted. The Court is therefore required to hear plaintiffs' claims. Fourth and finally, plaintiffs satisfied the 10-year limitations period. Plaintiffs are therefore not time-barred from bringing suit. The Court therefore has subject-matter jurisdiction over these cases.

## B.    Personal Jurisdiction.

The FSIA provides specific statutory rules controlling when a federal district court shall have personal jurisdiction over a foreign state, *see* § 1608, and ordinary minimum-contacts requirements of the Fifth Amendment do not apply to non-person foreign entities, *see TMR Energy*, 411 F.3d at 299–302. Under both the statutory rules and the minimum-contacts test, the definition of foreign state otherwise applicable to provisions of the FSIA does not apply; Congress and the courts distinguish between a foreign state itself and a political subdivision, agency, or instrumentality (collectively, "entities") thereof. § 1603(a) (defining "foreign state" for all FSIA sections except § 1608); § 1608 (setting forth statutory distinctions between foreign states and entities thereof); *TMR Energy*, 411 F.3d at 299–302 (discussing jurisprudential distinctions between foreign states and entities thereof). Applying these distinctions, the Court has personal jurisdiction under the FSIA over Iran—a foreign state itself—and MOIS—a political subdivision thereof—and the minimum-contacts test does not apply.

### 1.    FSIA-Specific Rules.

The FSIA establishes the requirements for proper service upon a foreign state or a political subdivision of a foreign state. *See* Fed. R. Civ. P. 4(j)(1). The FSIA prescribes four methods of service, in descending order of preference. Plaintiffs must attempt service by the first method (or determine that it is unavailable) before proceeding to the second method, and so on. *See* 28 U.S.C. § 1608(a).

The preferred method of service is delivery of the summons and complaint "in accordance with any special arrangement for service between the plaintiff and the foreign state." 28 U.S.C. § 1608(a)(1). If no such arrangement exists, then delivery is to be made "in accordance with an applicable international convention

on service of judicial documents." *Id.* § 1608(a)(2). If neither of the first two methods is available, plaintiffs may send the summons, complaint, and a notice of suit (together with a translation of each into the official language of the foreign state) "by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." *Id.* § 1608(a)(3). Finally, if mailed service cannot be accomplished within thirty days, then the statute permits plaintiffs to request that the clerk of the court dispatch two copies of the summons, complaint, and notice of suit (together with a translation of each into the foreign state's official language) to the Secretary of State, who then "shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted." *Id.* § 1608(a)(4).

*Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008)).[2]

In this case, no special arrangements for service exist between Iran and plaintiffs or intervenors, nor is Iran a party to any applicable international convention on service of judicial documents. *See* U.S. Dep't of State, Bureau of Consular Affairs, Service Of Legal Documents Abroad, http://travel.state.gov/law/judicial/judicial_680.html (last visited Sept. 24, 2010) (discussing international conventions on service of process); Hague Conf. on Private Int'l Law, Status Table, http://hcch.e-vision.nl/index_en.php?act=conventions.status&cid=17 (last visited Sept. 24, 2010) (showing that Iran is not a signatory to the Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil or Commercial Matters). The first two methods of service are therefore inapplicable. Concerning the third method, plaintiffs and intervenors attempted to serve the summons, complaint, and notice of suit, translated into Farsi, the official language of Iran, to the head of the Iranian Ministry of Foreign Affairs, but to no avail; service was refused.

Plaintiffs and intervenors therefore requested that the clerk dispatch two copies of the summons, complaint, and notice of suit, translated into Farsi, to the Secretary of State. The

---

[2] See § 1608(b) for language applying to service of agencies and instrumentalities of foreign states.

Court granted plaintiffs' and intervenors' requests, the clerk dispatched the documents, and the Secretary of State transmitted one copy of the documents to Iran via a diplomatic note though the Embassy of the Swiss Confederation while returning the other copy to the clerk. Plaintiffs and intervenors therefore properly served defendants under § 1608(a)(4).

### 2. Fifth-Amendment Requirements.

The Due Process Clause of the Fifth Amendment to the U.S. Constitution mandates that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." In civil cases against persons, then, the Due Process Clause "requires that if the defendant 'be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95 (D.C. Cir. 2002) (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (internal quotation omitted)). "In the absence of such contacts, the liberty interest protected by the Due Process Clause shields the defendant from the burden of litigating in that forum." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72 (1985)). Whether this minimum-contacts requirement applies to defendants sued under the FSIA depends on whether such defendants are persons under the Due Process Clause.

Concerning foreign states themselves, this Circuit has squarely held that "foreign states are not 'persons' protected by the Fifth Amendment." *Id.* at 96. As the Circuit later put it, "as a constitutional matter, there is no constitutional matter." *I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184, 1191 (D.C. Cir. 2003). The Circuit reasoned that "in common usage, the term 'person' does not include the sovereign." *Price*, 294 F.3d at 96 (quoting *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64 (1989) (internal quotation omitted)). Moreover,

because states of the United States are not persons entitled to the Fifth Amendment Due Process protections, *South Carolina v. Katzenback* 383 U.S. 301, 323–24 (1966), "absent some compelling reason to treat foreign sovereigns more favorably than 'States of the Union,' it would make no sense to view foreign states as 'persons' under the Due Process Clause," *Price*, 294 F.3d at 96.   Because foreign states themselves are not persons and thus not entitled to Fifth Amendment Due Process Protections, plaintiffs and intervenors need not show any contacts threshold between Iran and the District of Columbia.

Concerning entities of a foreign state, the issue is whether a state "exerted sufficient control over" the entity "to make it an agent of the [s]tate." *TMR Energy*, 411 F.3d at 301.  If such control is exerted, "then there is no reason to extend to" such entity "a constitutional right that is denied to the sovereign itself." *Id.*[3]  This Circuit has held that "plenary control" by a state over an entity thereof is sufficient to conclude that the entity is not a person under the Fifth Amendment.  *Id.*  For example, in *TMR Energy* the State of Ukraine had plenary control over the State Property Fund of Ukraine because the Fund's operations were funded and regulated by, and its leaders were chosen by, the State.  *Id.* at 301–02.  MOIS, which operates as the foreign and domestic intelligence agency of Iran, is funded by Iran and operates under the guidance of Iranian Supreme Leader Ayatollah Ali Khamenei.  It is clear, then, that Iran has plenary control of MOIS, which is therefore not a person entitled to Fifth Amendment Due Process protections.

---

[3] *Price*, which was limited to the issue of personhood of foreign states themselves, "express[ed] no view as to whether other entities that fall within the FSIA's definition of 'foreign state'"—political subdivisions, agencies, and instrumentalities thereof—"could yet be considered persons under the Due Process Clause."  294 F.3d at 99–100.  The later case of *TMR Energy* took on the issue expressly avoided by *Price*, but did so only for agencies and instrumentalities of foreign states.  411 F.3d at 300–02.  The logic of *TMR Energy*, however, applies with equal force to political subdivisions of foreign states: if a foreign state exercises sufficient control over a political subdivision thereof such that the political subdivision may be considered an agent of the state itself, the subdivision-agent is no more a person entitled to Fifth Amendment Due Process than the state-principal.

Plaintiffs and intervenors need not show any contacts threshold between MOIS and the District of Columbia.

### 3.    Customary International Law.

In previous cases, this Circuit has also considered the effect of customary international law and whether it requires a minimum-contacts-like test. *TMR Energy*, 411 F.3d at 302. According to the Court of Appeals, "[c]ustomary international law comes into play only 'where there is no treaty[] and no controlling executive or legislative act or judicial decision.'" *Id.* (quoting *The Paquete Habana*, 175 U.S. 677, 700 (1900)). "Never does customary international law prevail over a contrary federal statute." *Id.* (citing *Comm. of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 939 (D.C. Cir. 1988)). Here, the FSIA and Fifth Amendment jurisprudence control. The Court therefore need not decide whether customary international law would require some contacts threshold between defendants and the District of Columbia; even if it did, it would not apply.

### 4.    Conclusions Concerning Personal Jurisdiction.

First, plaintiffs and intervenors properly served defendants under FSIA-specific rules. Second, defendants are not persons entitled to Fifth Amendment Due Process, making unnecessary any consideration of their contacts with this forum. Third, customary international law, regardless of the extent to which it may call for a minimum-contacts-like test, does not apply. The Court therefore has personal jurisdiction over defendants in this case.

## V.    Liability.

The FSIA prescribes which entities are subject to liability as defendants under the FSIA-created cause of action, the individuals or entities to whom or which defendants may be liable, and for what actions such liability may attach. In this case, both defendants are liable to

plaintiffs and intervenors for acts of extrajudicial killing and the provision of material support and resources for such killing, but are not liable for acts of torture because no such acts were committed.

### A. Entities Subject to Liability.

The FSIA restricts entities subject to liability under its federal cause of action to (1) a "foreign state [(2)] that is or was a state sponsor of terrorism as described" in the elements concerning the requirement to hear a claim, and (3) "any official, employee, or agent of that foreign state [(4)] while acting within the scope of his or her office, employment, or agency." § 1605A(c). The FSIA also makes clear that "a foreign state shall be vicariously liable for the acts of its officials, employees, or agents." *Id.*

In this case, the named defendants are Iran and MOIS, both of which are considered a "foreign state," *see* discussion *supra* Part IV.A.1., and both of which were designated state sponsors of terrorism at all times and for reasons giving rise to liability under the FSIA, *see* discussion *supra* Part IV.A.3. Additionally, the bases for the alleged liability of these defendants are actions of their officials, employees, and agents; officials and employees of MOIS funded, technically assisted, and operationally controlled its agents of Hezbollah in planning and carrying out the Beirut bombing. Defendants are therefore subject to liability under the FSIA.

### B. Individuals or Entities to Whom or Which a Defendant May Be Liable.

The FSIA prescribes which individuals qualify as those to whom entities subject to liability may be liable. Such individuals include "(1) a national of the United States[;] (2) a member of the armed forces[;] (3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment[;] or (4) the legal representative of [any such] person."

§ 1605A(c).  The FSIA elaborates on the first class of individuals by defining "national of the United States" to mean "a citizen of the United States[] or . . . a person who, though not a citizen of the United States, owes permanent allegiance to the United States," 8 U.S.C. § 1101(22); § 1605A(h)(5), and the second by defining "armed forces" to mean "the Army, Navy, Air Force, Marine Corps, and Coast Guard," 10 U.S.C. § 101(a)(4); § 1605A(h)(4).

The Court is satisfied, based on plaintiffs' uncontroverted allegations, that Armondo Ybarra, John L'Heureux, Elizabeth Murphy, and Bryan Harris are U.S. citizens, and that decedent Terrence Rich was a U.S. citizen while alive.  Pls.' Compl. ¶ 1.  The Court is further satisfied, based on affidavits of intervenors, that intervenor plaintiffs are also U.S. citizens.  *See* Wells Aff., Sept. 20, 2010, ECF No. 60; Jane L'Heureux Aff., Sept. 20, 2010, ECF No. 61; Kerry L'Heureux Aff., Sept. 20, 2010, ECF No. 62.  All plaintiffs and intervenors are, therefore, individuals or entities to whom or which defendants may be liable under the FSIA-created cause of action.

### C.    Defendants' Liability in This Case.

Under the FSIA terrorism exception, foreign states are liable for (1) any "act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision . . . is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency"; (2) where such act is committed or provision provided by "that foreign state, or of an official, employee, or agent of that foreign state"; (3) which "caused [(4)] personal injury or death"; and (5) "for which Courts of the United States may main jurisdiction for money damages."  § 1605A(a)(1), (c).  When viewed together, the third and fourth elements of this

FSIA-created general cause of action require plaintiffs and intervenors to prove a theory of

liability under which defendants cause the requisite injury or death.

**1.      Acts for Which Defendants Are Liable.**

First, concerning acts for which defendants may be liable, plaintiffs and intervenors plead

three: torture, extrajudicial killing, and the provision of material support and resources therefor.

The FSIA provides definitions of these acts, which guide the analysis of whether such acts

occurred with respect to the Beirut bombing.  As discussed below, defendants committed acts of

extrajudicial killing and provided material support and resources for such killing, but defendants

did not commit torture.

> "[T]orture" means [(1)] any act, [(2)] directed against an individual in the
> offender's custody or physical control, [(3)] by which severe pain or suffering
> (other than pain or suffering arising only from or inherent in, or incidental to,
> lawful sanctions), whether physical or mental, [(4)] is intentionally inflicted on
> that individual [(5)] for such purposes as obtaining from that individual or a third
> person information or a confession, punishing that individual for an act that
> individual or a third person has committed or is suspected of having committed,
> intimidating or coercing that individual or a third person, or for any reason based
> on discrimination of any kind.

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(b), 106 Stat. 73, 73 (1992);

§ 1605A(h)(7).  *See generally* 44B Am. Jur. 2d *International Law* § 152.  For example, the six-

year imprisonment of; beating of; and deprivation of food, light, toilet facilities, and medical care

to an American professor at a Lebanese university constituted torture.  *Sutherland v. Islamic*

*Republic of Iran*, 151 F. Supp. 2d 27 (D.D.C. 2001) (Lamberth, J.).  Similarly, depriving a

hostage "of adequate food, light, toilet facilities, and medical care for 564 days amounts to

torture."  *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27 (D.D.C. 2001) (Lamberth, J.).

The facts of this case, however, do not support a similar conclusion.  Unlike in *Sutherland* and

*Jenco*, the defendants here never had custody or physical control over the victims of the Beirut

bombing.  Hezbollah did not kidnap or imprison the soldiers of the 24th MAU; indeed, the

contact between Iranian agents and the victims in this case was fleeting—only the time it took to

drive an explosives-laden truck into a building.  The Beirut bombing, therefore, does not

constitute torture under the FSIA.

> "[E]xtrajudicial killing" means a [(1)] deliberated killing [(2)] not
> authorized by a previous judgment pronounced by a regularly constituted court
> [(3)] affording all the judicial guarantees which are recognized as indispensable
> by civilized peoples.  [(4)] Such term, however, does not include any such killing
> that, under international law, is lawfully carried out under the authority of a
> foreign nation.

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992);

§ 1605A(h)(7).  As this Court has previously found, and now reconfirms, Hezbollah, Iran, and

MOIS deliberately killed 241 American military servicemen in the Beirut bombing.  *Peterson I*,

264 F. Supp. 2d at 61.  They in no way acted as a regularly constituted court and had no

authority to authorize such killings.  *Id.*  Indeed, through their use of terroristic violence

defendants acted contrary to, not in conformity with, those guarantees recognized as

indispensable by civilized people.  The Beirut bombing, therefore, constitutes extrajudicial

killing.

> "[M]aterial support or resources" means any property, tangible or
> intangible, or service, including currency or monetary instruments or financial
> securities, financial services, lodging, training, expert advice or assistance,
> safehouses, false documentation or identification, communications equipment,
> facilities, weapons, lethal substances, explosives, personnel . . . , and
> transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1); § 1605A(h)(3).  Regarding financing, "[t]his Court has determined that

'the routine provision of financial assistance to a terrorist group in support of its terrorist

activities constitutes providing material support and resources for a terrorist act within the

meaning of the [terrorism exception of the FSIA].'"  *In re Islamic Republic of Iran Terrorism*

*Litig.*, 659 F. Supp. 2d (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 19 (D.D.C. 1998) (internal quotation omitted) (Lamberth, J.)). Additionally, this Court has found that "a plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act from which his claim arises." *Id.* (quoting *Flatow*, 999 F. Supp. at 19). As this Court has previously found, and now reconfirms, Iran and MOIS, through their officials and employees, provided financial support and technical expertise to Hezbollah, which, acting at the behest and under the operational control of defendants, was an agent of defendants. *Peterson I*, 264 F. Supp. 2d at 60–61. Further, such provision was done within the scope of the officers' office, employees' employment, and Hezbollah's agency: the goal of all involved was to support the execution of terrorist violence against the United States. Defendants, therefore, provided material support and resources for the Beirut bombing.

2. **Entities Liable.**

Second, concerning the entity that committed the act or provided the provision of material support and resources therefor, the wording of the FSIA is, at times, repetitive. Here, the section setting forth the elements of the federal cause of action specifies that liability for "acts described in subsection (a)(1)" of the FSIA terrorism exception shall apply only where such acts are committed by "that foreign state, or of an official, employee, or agent of that foreign state." § 1605A(c) One of the acts in subsection (a)(1) is the provision of material support or resources for another act, such as extrajudicial killing, but only where such provision is be made "by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." § 1605A(a)(1). The result is that, in the analysis of liability for the provision of material support for extrajudicial killing, the lines are blurred. The definition of such provision includes not only the provision itself, but requires that the provision be made

by a foreign state or an official, employee, of agent thereof. The second element then again requires that the act for which liability attaches—here, provision—be committed by a foreign state or an official, employee, or agent thereof. But in the analysis of liability for extrajudicial killing, the first element—the act—and the second element—the actor—are not repetitive. The definition of extrajudicial killing does not specify that the killer be a foreign state or an official, employee, or agent thereof; that part is left to the second element.

Thus, in the paragraphs above concerning the first element of liability for provision, the court has already concluded that officials, employees, and agents of defendants provided material support and resources to Hezbollah, and did so within the scope of their office, employment, and agency. As to the second element, then, the Court concludes once more that such provision was made by officials, employees, and agents of defendants. Concerning extrajudicial killing, the Court similarly concludes that Hezbollah, because it acted at the behest and under the operational control of defendants, acted as agents of defendants. Defendants are therefore liable because the extrajudicial killing and provision of material support and resources were committed by officials, employees, and agents of Iran and MOIS. *Peterson I*, 264 F. Supp. 2d at 60–61. Or, as one keen eyewitness to the attack put it the day after the bombing: "The Iranians have blood on their hands. The terrorists were too well equipped. You don't go to a local drug store and buy a couple of tons of TNT. That takes the support of a government." Petit, *supra* note 1, at 202.

### 3. Causation and Injury Generally.

As discussed above, there is no but-for causation requirement under the FSIA; proximate causation is sufficient. *See* discussion *supra* Part IV.A.2. The Court noted that plaintiffs had alleged several connections between defendants and the attack: Iran's high level technical participation facilitated the construction and deployment of the bomb so as to maximize its

destructive effect, defendants ordered the attack and oversaw its operation, and Iran financially

supported Hezbollah. *See id.*

Above, the Court only considered these connections as allegations; now, it finds once

again that these allegations are true. *See Peterson I*, 264 F. Supp. 2d at 58.

> [I]t is beyond question that Hezbollah and its agents received massive material
> and technical support from the Iranian government. The sophistication
> demonstrated in the placement of an explosive charge in the center of the Marine
> barracks building and the devastating effect of the detonation of the charge
> indicates that it is highly unlikely that this attack could have resulted in such loss
> of life without the assistance of regular military forces, such as those of Iran.

*Id.* The Court therefore concludes that these connections constitute proximate causation of

plaintiffs and intervenors' and intervenors' injuries, to the extent that they actually suffered such

injuries under a theory of recovery advanced by plaintiffs and intervenors.

In this case, servicemen who survived the attack advance theories of liability of assault,

battery, and intentional infliction of emotional distress; the estate of a serviceman who did not

survive advances a wrongful-death theory of recovery; and family members of such servicemen

advance theories of intentional infliction of emotional distress. The Court is presented with the

difficulty of evaluating these claims under the FSIA-created cause of action, which does not spell

out the elements of these claims that the Court should apply. Thus, the Court "is forced . . . to

apply general principles of tort law—an approach that in effect looks no different from one that

explicitly applies federal common law"—but "because these actions arise solely from statutory

rights, they are not in theory matters of federal common law." *Heiser v Islamic Republic of Iran*,

659 F. Supp. 2d 20, 24 (D.D.C. 2009) (Lamberth, C.J.) [hereinafter *Heiser II*]. The Court of

Appeals addressed this difficulty in *Bettis v. Islamic Republic of Iran*:

> The term "federal common law" seems to us to be a misnomer. Indeed, it is a
> mistake, we think, to label actions under the FSIA and Flatow Amendment for
> solatium damages as "federal common law" cases, for these actions are based on

statutory rights. . . . Rather, . . . because the FSIA instructs that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 1606, it in effect instructs federal judges to find the relevant law, not to make it.

315 F.3d 325, 333 (D.C. Cir. 2003). District courts thus look to Restatements, among other sources, "to find and apply what are generally considered to be the well-established standards of state common law." *Heiser II*, 659 F. Supp. 2d at 24. The Court will therefore now "turn to the Restatement (Second) of Torts 'as a proxy for state common law.'" *Id.* (quoting *Bettis*, 315 F. 3d at 333; citing *Sutherland*, 151 F. Supp. 2d at 48–50 (applying the Restatement to several tort claims).

### 4. Claims Brought by Survivors of the Attack: Assault, Battery, and IIED.

Survivors of the Beirut bombing have alleged assault, battery, and IIED. Defendants are liable under all three theories to these plaintiffs—Armando Ybarra and John L'Heureux.

Iran is liable for assault in this case if, when it committed extrajudicial killing or provided material support and resources therefor, (1) it acted "intending to cause a harmful contact with . . . , or an imminent apprehension of such a contact" by, those attacked and (2) those attacked were "thereby put in such imminent apprehension." Restatement (Second) of Torts § 21(1). It is clear that defendants acted with intent to cause harmful contact and the immediate apprehension thereof: acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm. *Valore*, 700 F. Supp. 2d at 76. Accepting these plaintiffs' uncontroverted assertions that they did, in fact, fear such harm because of the attack, Pls.' Compl. ¶¶ 24, 29, the Court concludes that defendants are liable for assault.

Survivors have also alleged battery. Iran is liable for battery in this case if, when it committed extrajudicial killing or provided material support and resources therefor, it acted

"intending to cause a harmful or offensive contact with . . . , or an imminent apprehension of such a contact" by, those attacked and (2) "a harmful contact with" those attacked "directly or indirectly result[ed]." Restatement (Second) of Torts § 13. Harmful contact is that which results in "any physical impairment of the condition of another's body, or physical pain or illness." *Id.* § 15. Again, it is clear that defendants acted with intent to cause harmful contact and the immediate apprehension thereof: acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of such harm. *Valore*, 700 F. Supp. 2d at 77. Accepting these plaintiffs' uncontroverted assertions that they did, in fact, suffer severe physical injury from the blast, Pls. Compl. ¶¶ 25, 30, the Court concludes that defendants are liable for battery.

Finally, survivors have also alleged intentional infliction of emotional distress. "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Restatement (Second) of Torts § 46(1). "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8 (D.D.C. 2009) (citing *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)). Accepting these plaintiffs' and intervenors' uncontroverted assertions that they did, in fact, suffer severe emotional and physical injury, Pls.' Compl. ¶¶ 26, 31, the Court concludes that defendants are liable for IIED.

The Court notes that these plaintiffs who have claimed assault, battery, and IIED may recover under only one of any such theories, as multiple recovery is prohibited. *See, e.g.*, *Beer v. Islamic Republic of Iran*, 574 F. Supp. 2d. 1, 13 (D.D.C. 2008) (prohibiting double recovery for

both IIED and wrongful death) (Lamberth, C.J.). The Court considers the amount of recovery to which these plaintiffs and intervenors are entitled in the section on damages below.

### 5. Claim Brought by an Estate for Wrongful Death.

A wrongful-death action is one brought by a decedent's heirs at law, and may be brought through the estate of the decedent, "for economic losses which result from a decedent's premature death." *Flatow*, 999 F. Supp. at 27. Only one estate-plaintiff has brought such a claim: the estate of Terrance Rich. Because defendants are liable for the extrajudicial killing of the decedent, *see* discussion *supra* Part IV.C.1., defendants are also liable for the economic damages caused to decedent's estate. The Court considers the amount of recovery to which this plaintiff is entitled in the section on damages below.

### 6. Claims Brought by Family Members of Victims for IIED.

Several family members of victims have brought IIED claims, alleging that extreme and outrageous conduct directed at third-person relatives caused these plaintiffs and intervenors severe emotional distress. These family members are plaintiffs Elizabeth Murphy and Bryan Harris—mother and half-brother, respectively, of Terrance Rich—and intervenors Mary E. Wells, Kerry M. L'Heureux, and Jane L. L'Heureux—mother and sisters, respectively, of John L'Heureux.[4]

---

[4] The Court notes that Elizabeth Murphy and Bryan Harris do not formally style their claim as one for IIED, but instead plead a claim for "loss of society." Pls.' Compl. ¶¶ 21–22. The particulars of the claim, however, read as one for IIED: "As the result of the death of Terrance Rich, his mother, Elizabeth Murphy, and surviving sibling, Bryan Harris, have suffered and will continue to suffer severe mental anguish and the loss of society." *Id.* ¶ 22. The sort of suffering claimed is compensated with solatium. *Valore*, 700 F. Supp. 2d at 85 ("Solatium is awarded to compensate the mental anguish, bereavement[,] and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent['s] society and comfort." (internal quotation marks omitted)). "Under the FSIA, a solatium claim is indistinguishable from an IIED claim." *Id.* Accordingly, the Court construes these plaintiffs' claim as an allegation of IIED.

Iran is liable in this case under such claims if it (1) engaged in extreme and outrageous conduct (2) which was directed at persons other than plaintiffs (3) which intentionally or recklessly caused severe emotional distress, but not necessarily bodily harm, (4) to such persons' immediate family members—the immediate-family requirement—who were present at the time such conduct occurred—the presence requirement. Restatement (Second) of Torts § 46(1)– (2)(a). Although this fourth element appears to prohibit recovery for emotional injury by those not in the immediate family of the person to whom extreme and outrageous conduct is directed or by those who are not present at the time such conduct occurs, the drafters of the Restatement include a caveat: "The [American Law] Institute expresses no opinion as to whether there may not be other circumstances under which the actor may be subject to liability for the intentional or reckless infliction of emotional distress." Restatement (Second) of Torts § 46 Caveat. In other words, there may be instances where it is appropriate to permit recovery by individuals not satisfying the immediate-family or presence requirements.

Plaintiffs and intervenors have easily proven the first three elements. "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress," *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8 (D.D.C. 2009) (citing *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)), and the conduct was directed at servicemen, not family-member plaintiffs or intervenors. The immediate-family and presence requirements, however, require more discussion.

Concerning the immediate-family requirement, this Court has previously "adopted the strict meaning of 'immediate family,' defined as one's spouse, parents, siblings, and children." *Heiser II*, 659 F. Supp. 2d at 28 (citing *Jenco*, 54 F. Supp. 2d at 36 n.8). Immediate family members do include those of the half blood, as "[s]iblings of half-blood to the servicemen in this

case are presumed to recover as a full-blood sibling would." *Peterson II*, 515 F. Supp. 2d at 52.

All family-member plaintiffs and intervenors satisfy this requirement as either parents of siblings of servicemen.[5] Concerning the presence requirement, the Restatement's caveat "suggests that . . . '[i]f the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present, no essential reason of logic or policy prevents liability.'" *Heiser II*, 659 F. Supp. 2d at 27 (quoting Dan B. Dobbs, The Law of Torts § 307, at 834 (2000)). As this Court has noted, "[t]errorism, unique among the types of tortious activities in both its extreme methods and aims, passes this test easily." *Id.* One therefore need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result. Family-member plaintiffs and intervenors, although not present at the Beirut bombing, may therefore recover for the emotional injuries they suffered as a result of that attack.

### D.     Jurisdiction.

In satisfaction of the final element of the FSIA-created cause of action, the Court has jurisdiction over this case, *see* discussion *supra* Part IV., for money damages, *see* discussion *infra* Part VI.

### E.     Conclusions Concerning Liability.

In this case, both defendants are considered a foreign state and were and are designated state sponsors of terrorism at all times and for reasons giving rise to liability under the FSIA. Additionally, the bases for the alleged liability of these defendants are actions of their officials, employees, and agents. Defendants are therefore subject to liability under the FSIA-created

---

[5] Although the Court has no occasion in this case to expand the immediate-family requirement to include non-immediate family members, the Court notes that is has been so expanded in a similar case. *See Valore*, 700 F. Supp. 2d at 79.

cause of action. Further, plaintiffs and intervenors all are or were nationals of the United States. Plaintiffs therefore fall into a class of individuals to whom defendants may be liable. Finally, though not liable for torture, defendants are liable for extrajudicial killing and the provision of material support and resources for such killing, which was committed by officials, employees, and agents of defendants; which caused injury under several theories of liability; and for which the Court has jurisdiction for money damages. Therefore, plaintiffs and intervenors may recover the appropriate amount of damages as determined by the Court *infra* Part VI.

## VI.    Damages.

The Court hereby adopts, just as it did in *Peterson*, all facts found and recommendations made by the special masters relating to all plaintiffs and intervenors in this case, except where recommendations as to family-member plaintiffs or intervenors deviate from the damages framework, discussed below. *Peterson II*, 515 F. Supp. 2d at 52–53. Any such deviations "shall be altered so as to conform with the respective award amounts set forth" in the framework, unless otherwise noted. *Id.* at 53.

### A.    Damages Available.

Damages available under the FSIA-created cause of action "include economic damages, solatium, pain and suffering, and punitive damages." § 1605A(c). Accordingly, those who survived the attack can recover damages for their pain and suffering, as well as any other economic losses caused by their injuries; estates of those who did not survive can recover economic losses stemming from wrongful death of the decedent; family members can recover solatium for their emotional injury; and plaintiffs who have requested them can recover punitive damages.

"To obtain damages against defendants in an FSIA action, the plaintiff must prove that the consequences of the defendants' conduct were 'reasonably certain (i.e., more likely than not) to occur, and must prove the amount of the damages by a reasonable estimate consistent with this [Circuit's] application of the American rule on damages.'" *Salazar*, 370 F. Supp. 2d at 115–16 (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003) (internal quotations omitted)). As discussed above, plaintiffs have proven that the defendants' commission of acts of extrajudicial killing and provision of material support and resources for such killing was reasonably certain to—and indeed intended to—cause injury to plaintiffs. The Court now discusses reasonable estimates of the different damages sought under the FSIA-created cause of action. The damages awarded are laid out in the tables in the separate Order and Judgment issued this date.

### B. Damages Awarded in This Case.

Survivors of the Beirut Bombing are entitled to damages for the pain and suffering they endured and continue to endure to this day, as well as damages for economic losses. The one estate plaintiff is entitled to damages for economic loss suffered by decedent's estate. Family members of victims of the Beirut Bombing are entitled to solatium. Finally, those plaintiffs who have requested them are entitled to punitive damages.[6]

### 1. Pain and Suffering of Survivors.

Damages for surviving victims are determined based upon an assessment of such factors as "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life."

---

[6] Plaintiffs and intervenors have also requested that the Court award costs of suit. Plaintiffs and intervenors do not need to specifically request that the Court award costs. Instead, they should prepare a bill of costs per Local Civil Rule 54.1.

*Peterson II*, 515 F. Supp. 2d at 52 n.26 (quotation omitted). "In awarding pain and suffering damages, the Court must take pains to ensure that individuals with similar injuries receive similar awards." *Peterson II*, 515 F. Supp. 2d at 54. Thus in *Peterson*, the Court granted a baseline award of $5 million to individuals suffering such physical injuries as compound fractures, severe flesh wounds, and wounds and scars from shrapnel, as well as "lasting and severe psychological pain." *Id.* The Court was willing to depart upward from this baseline to between $7.5 and $12 million in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead, as was one soldier who "was placed in a body bag [and] buried alive in a morgue for four days until someone heard him moaning in pain." *Id.* Similarly, the Court was willing to depart downward to between $2 and $3 million where victims suffered only minor shrapnel injuries or minor injury from small-arms fire. *Id.* With these considerations in mind, the Court now analyzes the recommendations of the special master.

Concerning Armando J. Ybarra, the special master recommended that the Court not deviate from its damages framework. Rpt. of Special Master Pursuant to Order of Reference Concerning Count V (Armando J. Ybarra) 11, June 10, 2010, ECF No. 55 [hereinafter Ybarra Rpt.]. In the immediate aftermath of the attack, Mr. Ybarra was buried under concrete for several hours, which cut and crushed—but did not break—his right leg, causing severe muscle and nerve damage. *Id.* at 5–6. The rest of his body was riddled with shrapnel. *Id.* at 6. Today, he has no feeling in his lower right leg; his injured limb is prone to recurrent infection; he requires the assistance of a cane, walker, or wheelchair for mobility; and suffers from depression and post-traumatic stress disorder. *Id.* at 7–8. These injuries are serious and life-long and

comport with the sorts of injuries for which a baseline award is made. Accordingly, the Court agrees that Mr. Ybarra should receive $5,000,000.00 in damages for pain and suffering.

Concerning John E. L'Heureux, the special master recommended that the Court depart upward from its baseline to $7.5 million. Rpt. of Special Master Pursuant to Order of Reference Concerning Count VI (John L'Heureux) 20, July 15, 2010, ECF No. 56 [hereinafter L'Heureux Rpt.]. In the immediate aftermath of the Attack, Mr. L'Heureux suffered severe and multiple injuries, including an "impaled rectum by an object that split his sphincter and pierced his stomach; [a] crushed kidney; [a] fractured pelvis; [a] detached ear; cuts and abrasions over 80 to 90% of his body; [the wearing of a] colostomy bag for 11 months[,] and damage to his legs and feet that confined him to a wheelchair for many months." *Id.* at 5. Today, he continues to suffer from severe physical and emotional pain, including anxiety and post-traumatic stress disorder. *Id.* at 7. He is 100% disabled. *Id.* at 20. Given the severity, number, and life-long deleterious effect of Mr. L'Heureux's injuries, the Court agrees that an upward departure is warranted. Accordingly, the Court agrees that Mr. L'Heureux should receive $7,500,000.00 in damages for pain and suffering.

### 2. Economic Loss of Survivors.

In addition to pain and suffering, the plaintiffs who survived the attack proved to the satisfaction of the special master, and thus to the satisfaction of the Court, lost wages resulting from permanent and debilitating injuries suffered in the attack. *See* Ybarra Rpt. 11–12, L'Heureux Rpt. 20–21. Based on economic reports submitted to the special master by a forensic economist, the master recommends that Mr. Ybarra should receive $2,123,146.00 and that Mr. L'Heureux should receive $3,197,369.00. in damages for economic loss. The Court agrees.

### 3. Economic Loss of Decedent.

The one estate plaintiff—Estate of Terrance Rich—has proven to the satisfaction of the special master, and thus to the satisfaction of the Court, loss of accretions to the estate resulting from the wrongful death of decedent in the attack. *See* Rpt. of Special Master Pursuant to Order of Reference Concerning Count IV (Elizabeth Murphy and Bryan Harris), July 22, 2010, ECF No. 57 [hereinafter Rich Rpt.]. Based on economic reports submitted to the special master by a forensic economist, the master recommends that the estate should receive $1,545,055.00. The Court agrees.

### 4. Solatium of Family Members.

Solatium is awarded to compensate the "the mental anguish, bereavement[,] and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent['s] society and comfort." *Belkin*, 667 F. Supp. 2d at 22 (citing *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 196–97 (D.D.C. 2003); *Elahi*, 124 F. Supp. 2d at 110). "In determining the appropriate award of damages for solatium, the Court may look to prior decisions awarding damages for intentional infliction of emotional distress as well as to decisions regarding solatium." *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008) (citing *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 71 (D.D.C. 2006) (Lamberth, J.)) (Lamberth, C.J.).

In *Peterson*, this Court adopted the framework set forth in *Heiser* as "an appropriate measure of damages for the family members of victims who died" in the Beirut bombing. *Peterson II*, 515 F. Supp. 2d at 51 (citing *Heiser I*, 466 F. Supp. 2d at 271–356). That framework awarded valid claims brought by parents and siblings of deceased servicemen $5 million and $2.5 million each, respectively. Relatives of surviving servicemen received awards

valued at half of the awards to family members of the deceased: $2.5 million for parents, and $1.25 million for siblings.  Although "the loss suffered" by family members of victims "is undeniably difficult to quantify," *Heiser I*, 466 F. Supp. 2d at 269, a review of similar cases shows that the damages framework as laid out in *Peterson* has strong precedential support, *see, e.g.*, *Valore*, 700 F. Supp. 2d at 85; *Brewer*, 664 F. Supp. 2d at 57–58; *Heiser II*, 659 F. Supp. 2d at 27 n.4; *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 113 (D.D.C. 2000); *Eisenfeld*, 172 F. Supp. 2d at 10–11; *Flatow*, 999 F. Supp. at 29–32.

These numbers, however, are not set in stone.  The Court may award greater amounts in cases "with aggravating circumstances," *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 108 (D.D.C. 2006) (Lamberth, J.), indicated by such things as "[t]estimony which describes a general feeling of permanent loss or change caused by decedent's absence" or "[m]edical treatment for depression and related affective disorders," *Flatow*, 999 F. Supp. at 31.  Such departures are usually relatively small, absent "circumstances that appreciably worsen" a claimant's "pain and suffering, such as cases involving torture or kidnapping" of the party to whom extreme and outrageous conduct was directed.  *Greenbaum*, 451 F. Supp. 2d at 108 (departing upward from $8 million to $9 million in a widower's award upon consideration of "the severity of his pain and suffering due to the loss of his wife and unborn first child").  Conversely, the Court may depart downward in amount where the relationship between the claimant and the decedent is more attenuated.  *See, e.g.*, *Smith ex rel. Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 236 (S.D.N.Y. 2003).  With these considerations in mind, the Court now analyzes the recommendations of the special master.

The special master found no circumstances compelling a deviation form the damages framework for any family-member plaintiffs or intervenors in this case.  Rich Rpt. 15;

L'Heureux Rpt. 20. The Court agrees. Although these plaintiffs and intervenors suffered great personal loss at the death of family members dearly loved, none suffered the particularly devastating and uniquely acute suffering warranting an upward departure, such as nervous breakdowns or self-destructive behavior. *See, e.g.*, *Valore*, 700 F. Supp. 2d at 86. Accordingly, the Court agrees that Elizabeth Murphy, mother of deceased serviceman Terrance Rich, should receive $5,000,000.00; Bryan Harris, half-brother of decedent Terrance Rich, should receive $2,500,000.00; Mary E. Wells, mother of surviving serviceman John L'Heureux, should receive $2,500,000.00; and Kerry M. L'Heureux and Jane L. L'Heureux, sisters of surviving serviceman John L'Heureux, should each receive $1,250,000.00.

### 5. Punitive Damages.

Only two plaintiffs—Armando J. Ybarra and John E. L'Heureux—have specifically requested an award of punitive damages. Pls.' Compl. ¶¶ 27, 32. Neither the other plaintiffs nor intervenors have made a similar request in their pleadings. *See* Pls.' Compl; Ints.' Compl. "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c). Accordingly, in this default judgment, the Court will only award punitive damages to those plaintiffs who have demanded them.

Punitive damages, only recently made available under the revised FSIA terrorism exception, serve to punish and deter the actions for which they awarded. *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 61; *Heiser II*, 659 F. Supp. 2d at 29–30; *Acosta*, 574 F. Supp. 2d at 30 (citing Restatement (Second) of Torts § 908(1)). Punitive damages are not meant to compensate the victim, but instead meant to award the victim an amount of money that will punish outrageous behavior and deter such outrageous conduct in the future. In determining the proper punitive damages award, courts evaluate four factors: "(1) the character of the

defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Acosta*, 574 F. Supp. 2d at 30 (citing *Flatow*, 999 F. Supp. at 32 (citing Restatement (Second) of Torts § 908)). The nature of the defendants' acts and the nature and extent of the harm defendants intentionally caused are among the most heinous the Court can fathom. *See Bodoff*, 424 F. Supp. 2d at 88 (determining a bus bombing, for which Iran was held liable, to be "extremely heinous").

"The defendants' demonstrated policy of encouraging, supporting and directing a campaign of deadly terrorism is evidence of the monstrous character of the bombing that inflicted maximum pain and suffering on innocent people." *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 278 (D.D.C. 2003) (concerning a separate bus bombing for which Iran and MOIS were held liable). As to deterrence and wealth, Dr. Patrick Clawson, an expert on Iranian terrorism activities, has testified in several cases on the amounts of punitive damages that would serve to deter Iran from supporting terrorist activities against nationals of the United States. *See, e.g.*, *Flatow*, 999 F. Supp. at 32; *Heiser II*, 659 F. Supp. 2d at 30. Two numbers are at issue: the multiplicand—the amount of Iran's annual expenditures on terrorist activities—and the multiplier—the factor by which the multiplicand should be multiplied to yield the desired deterrent effect.

Concerning the multiplicand, most recently in *Valore*, Dr. Clawson declared that "the financial material support provided by Iran in support of terrorism is in the range of $300 million to $500 million a year." Clawson Aff. ¶ 4, *Valore*, No. 03-cv-1959 (D.D.C. Mar. 31, 2010), ECF No. 58. Dr. Clawson based his range on Iran's provision of approximately $200 million in direct cash assistance to Hezbollah in 2008, as well as the provision since 2006 of "many tens of millions of dollars" worth of sophisticated weaponry, including some 40,000 rockets. *Id.* ¶ 3.a.

(citing U.S. Dep't of State, *Country Reports on Terrorism 2008*, at 183 (2009), *available at* http://www.state.gov/documents/organization/122599.pdf.).  The Court adopted $200 million as the multiplicand in *Valore*, as that value was "based on the known amount of Iran's annual cash assistance specifically to Hezbollah and does not require the Court to waver from its neutrality concerning terrorism financing by hazarding a guess as to the value of any non-cash assistance also provided to Hezbollah."  700 F. Supp. 2d at 88.

Concerning the multiplier, Dr. Clawson testified in *Flatow* that a factor of three times Iran's annual expenditures on terrorism "would be the minimum amount in punitive damages that would affect the conduct of the Islamic Republic of Iran, and that a factor of up to ten times its annual expenditure for terrorism must be considered to constitute a serious deterrent to future terrorist activities aimed at United States nationals."  999 F. Supp. at 32.  In *Heiser*, however, he recommended a factor between three and five, as opposed to three and ten.  659 F. Supp. 2d at 30.  In both cases, the Court conservatively adopted the lower multiplier of each range: three.

In the action to which this action is related—*Valore*—the Court adopted five as the multiplier.  700 F. Supp. 2d at 89.  This higher number was "based on the suggestion by Dr. Clawson that Iran has recently begun to more actively participate in litigation in the United States and elsewhere."  *Id.* (citing Clawson Aff. ¶ 6).  The Court emphatically pronounced that "Iran's support of terrorism against citizens of the United States absolutely will not be tolerated by the courts of this nation" and that "adopting five as a multiplier . . . will hold Iran to account."  *Id.*  Multiplying $200 million by five, the Court awarded punitive damages in the amount of $1 billion.  *Id.*

Today, the Court is faced with a quandary.  Punitive damages have already been awarded in *Valore*, which concerned the same incident as this case—the Beirut Bombing.  Recurrent

awards in case after case arising out of the same facts can financially cripple a defendant, over-punishing the same conduct through repeated awards with little additional deterrent effect, and awards in several cases arising out of the same facts can differ, creating anomalous results. 1 Linda L. Schlueter, *Punitive Damages* § 4.4(A)(5)(b)–(c) (5th ed. 2005); 1 John J. Kircher & Christine M. Wiseman, *Punitive Damages, Law and Practice* § 5:26 (2d ed. 2000); *see State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 423 (2003) (noting concern for "multiple punitive damages awards for the same conduct"). How, then, should the Court award punitive damages in a subsequent case arising out of the same facts as a former case in which punitive damages have already been awarded? The Supreme Court's recent decision in *Philip Morris USA v. Williams* offers insight into how the Court might answer this question. 549 U.S. 346 (2007).

In *Phillip Morris*, the Court held that punitive damages may only be awarded to punish and deter actions of defendants with respect to the plaintiffs in the particular case in which punitive damages are sought. *Id.* at 356–57. Punitive damages may not be issued to punish harm caused to others who are not party to a suit, as such damages would constitute an unconstitutional taking of property from defendants without due process. *Id.* at 349, 353–55. In other words, "under *Phillip Morris* punitive damages awards are personal to each plaintiff." Byron G. Stier, *Now It's Personal: Punishment and Mass Tort Litigation After* Philip Morris v. Williams, 2 Charleston L. Rev. 433, 454 (2008). *Phillip Morris* has thus largely solved the problem of multiple punishments: when punitive damages are personal to plaintiffs in a given case, they are not necessarily excessive when awarded in a subsequent case, even arising out of the same facts, if the subsequent case involves different plaintiffs. *See id.* at 454–58.

But the question still remains: What is the proper punitive-damages award in such a subsequent case?  If the Court were to simply re-enter an award of $1 billion in this case, which involves only two plaintiffs who have requested punitive damages, after having previously entered the same amount in the consolidated *Valore*, which involved approximately 100 plaintiffs who requested punitive damages, the disparity between the two cases' plaintiffs' shares of punitive damages would be severe.  The Court is not concerned with that disparity from the perspective of compensation.  Punitive damages are not intended to compensate plaintiffs.  The fact that there may be variance from one case to another, even where those cases arise out of the same facts, such that some plaintiffs enjoy a higher award than others, raises no concern for inequitable compensation.  The Court is concerned, however, with that disparity from the perspective of the post-*Phillip Morris* plaintiff-personal purpose of punishment.

Where there is more than one case arising out of the same facts, an analysis of the amount of punitive damages awarded compared with the amount of compensatory damages awarded can be used to gauge the amount of punishment and deterrence the Court considered necessary based on the injuries plaintiffs to that case suffered.  Where injuries suffered by separate plaintiffs in a second case are of the same sort as those suffered by plaintiffs in the first, there is no reason to deviate in the second case from the conclusion reached in the first as to the ratio of punitive-to-compensatory damages.  For example, if a court awarded $1,000,000.00 in punitive damages and $100,000.00 in compensatory damages in the first case, it makes sense to award $10.00 in punitive damages for every $1.00 awarded as compensatory in the second.  Adopting this method, the Court will comport with its conclusions made in *Valore* as to the appropriate level of punishment and deterrence needed, while also ensuring that punitive damages are personal to plaintiffs in this case.

In *Valore*, the Court awarded damages in the amount of $1,290,291,092.00, of which $290,291,092.00 was compensatory and $1,000,000,000.00 was punitive. Revised Order and Judgment, *Valore*, No. 03-cv-1959 (D.D.C. Sept. 20, 2010), ECF No. 71. The Court thus concluded that for every dollar's worth of injury as measured by compensatory damages, the appropriate amount needed to punish defendants for and deter defendants from terrorism was $3.44 (when rounded to the nearest cent). The Court retains that ratio today.[7] Accordingly, for

---

[7] In *Exxon Shipping Co. v. Baker*, the Supreme Court recently limited a punitive damages award to a maximum of a 1:1 ratio with compensatory damages awarded. 128 S. Ct. 2605 (2008). In *Valore*, the Court distinguished *Exxon*:

> To the extent that some plaintiffs may share in a punitive damages award higher than their compensatory award, and thus with a ratio of punitive to compensatory damages higher than 1:1, *Exxon* is distinguishable from this case. First, *Exxon* concerned punitive damages awarded under maritime law, not the FSIA; the Supreme Court explicitly limited its holding, noting that "a 1:1 ratio . . . is a fair upper limit *in such maritime cases*." [*Exxon*, 128 S. Ct.] at 2633 (emphasis added). But more importantly, the Supreme Court decided a case "with no earmarks of exceptional blameworthiness in the punishable spectrum." *Id*. When "the supertanker Exxon Valdez grounded on Bligh Reef off the Alaskan coast, fracturing its hull and spilling millions of gallons of crude oil into Prince William Sound," the defendants acted recklessly but "without intentional or malicious conduct." *Id*. at 2612, 2631 n.23, 2633. The Supreme Court left open the possibility that defendants who do act with intent or malice might be subject to higher ratios of punitive to compensatory damages. See *id*. at 2633.
>
> This is a case where higher ratios are clearly warranted. Those harboring a deep-seeded and malicious hatred of the United States who intentionally commit terroristic murder of American military servicemen deserve to be punished at a ratio significantly higher than 1:1 with the compensatory damages for which they are otherwise liable. Moreover, even after Exxon, this District has repeatedly awarded punitive-damages awards in FSIA cases without concern that such damages may have been awarded at a higher ratio than 1:1 with compensatory damages. *See, e.g.*, *Heiser II*, 659 F. Supp. 2d at 30–31; *Acosta*, 574 F. Supp. 2d at 30–31; *Brewer*, 664 F. Supp. 2d at 59 ("There is no reason to depart from settled case law regarding the amount of punitive damages in terrorism cases.").

*Valore*, 700 F. Supp. 2d at 89 n.17; *see also Duckworth v. U.S. ex rel. Locke*, 2010 WL 1499490, at *16 n.14. (D.D.C. Apr. 15, 2010). The Court retains this distinction today.

those plaintiffs who have prayed for punitive damages, the Court will award $3.44 in punitive damages for every dollar of compensatory damages awarded to each such plaintiff.

## VIII. Conclusion.

Iran and MOIS are responsible for the deaths and injuries of hundreds of American servicemen; are liable for physical, emotional, and pecuniary injuries suffered as a result; and deserve to be punished to the fullest legal extent possible. In a recent interview, Iranian President Mahmoud Ahmadinejad declared that he and his country "oppose terrorism. We strongly oppose" it. Interview by George Stephanopoulos, Chief Political Correspondent, ABC News, with Mahmoud Ahmadinejad, President, Iran (May 5, 2010), *transcript available at* http://abcnews.go.com/print?id=10558442. The Court sincerely hopes that the compensatory damages awarded today help to alleviate plaintiffs' and intervenors' injuries, and that the punitive damages also awarded inspire Iran to adhere to its professed opposition to terrorism.

A separate Order and Judgment consistent with these findings shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on September 24, 2010.